EXHIBIT A

# Transcript of the
# **HEARING HELD**

**Date:** APRIL 25-26, 2012

**Case:** B.A. WACKERLI CO. v. VOLKSWAGEN OF AMERICA , INC AND
AUDI OF AMERICA, INC.

Printed On: July 30, 2012

Burnham, Habel _ Associates, Inc.
Phone:(208) 345-5700
Fax:(208) 345-6374
Email:mgr@burnhamhabel.com
Internet:

1       A.    To the facility that we're currently at.

2    It's -- it was a used car facility, I think, roughly a

3    mile or so away from the existing dealership.

4       Q.    And was that proposal to relocate to that

5    specific facility -- was that a concern to Audi?

6       A.    Definitely.

7       Q.    Why is that?

8       A.    Because this facility didn't meet our

9    requirements by any stretch.

10       Q.    And were there any other concerns about the

11    facility itself?

12       A.    There was a separation in that the -- the

13    prior -- the -- the existing dealership at the time was

14    a -- was a complete dealership in the sense that there

15    were sales operations and service operations all wholly

16    contained.

17           In this facility the service operation was --

18    where the work -- where the service work was being done,

19    the repair on the vehicles was being proposed to be done

20    across the street in a facility that was definitely a

21    step backwards from where they were currently

22    operating.

23       Q.    Okay.  So step backwards in what sense?

24       A.    In terms of the working conditions, if

25    nothing else.  Again, it was -- the old dealership had a

1   fairly large work space in order to -- for the

2   technicians to work on the vehicles.  Parts were all

3   located there.  The whole management team was located

4   there.

5           The other facility, basically the cars were

6   being pulled into a garage.  It just -- it didn't offer

7   what I considered a -- a working environment that was on

8   par with what the technicians were used to.

9       Q.   And why would a working environment not on

10  par with what the technicians were used to be a concern

11  to Audi?

12      A.   Technicians are in high demand.  So if

13  they're not happy where they're at, they can very easily

14  find another job.

15      Q.   And technicians.  We're talking about the

16  service techs, the people who actually fix vehicles?

17      A.   Yes.

18      Q.   And so the concern was that there could be

19  turnover?

20      A.   Yes.

21      Q.   Do you know whether there was any turnover

22  with respect to Wackerli's service technicians?

23      A.   Eventually they lost all their certified

24  technicians.

25      Q.   And what does that mean?  What's a certified

1    A.    Yes.

2        Q.    Okay.  What is your understanding of what

3   this document is?

4        A.    This is a basic outline, basic summary, of

5   the settlement that we would agree to between ourselves

6   and B.A. Wackerli.

7        Q.    And if we take a look at some of the terms

8   that were outlined, in Roman I it says:  "Volkswagen

9   ('VW') and Audi dealership franchise agreements will be

10  assumed pursuant to . . . the bankruptcy code"; is that

11  right?

12       A.    Yes.

13       Q.    So was it your understanding that Volkswagen

14  and Audi were agreeing that Wackerli would continue to

15  be a Volkswagen dealer and an Audi dealer after the

16  bankruptcy?

17       A.    Yes.

18       Q.    Okay.  And then it says -- in Roman II it

19  says:

20            "The parties agree to a temporary

21            relocation of the VW/Audi show room

22            facility to 1400 North Holmes . . ."

23            Did I read that accurately?

24       A.    Yes.

25       Q.    Temporary relocation.  Why would that be a

1   temporary relocation?  Wasn't 1400 North Holmes where

2   the dealership was going to build their facility?

3        A.   That was the address location, but temporary

4   was that they were moving to a building that would house

5   us temporarily, with ultimately -- I think it's spelled

6   out here that ultimately they would build us a brand new

7   facility.

8        Q.   Okay.  And if we look at -- to your point, if

9   we look at Roman III --

10       A.   Uh-huh.

11       Q.   -- Roman numeral III, it says:

12            "Within the earlier of 18 months from the

13            date of confirmation or two years from

14            March 31, 2010, the Debtor," Wackerli,

15            "shall complete an Audi/VW dual brand

16            dedicated facility meeting VW/Audi

17            minimum facility standards."

18       A.   Yes.

19       Q.   Did I read that accurately?

20       A.   Yes.

21       Q.   So what was your understanding of the last

22   possible date at which Wackerli would be operating in

23   that temporary facility?

24       A.   March 31st, 2012.

25       Q.   Okay.  And at no later than March 31st, 2012

1      Q.    And if we take a look at the e-mail that --
2   there's an e-mail below, June 22nd, 2010, that VanHassel
3   sent to Mr. Kennard.  The second line says:
4              "Do you have an update on any the
5              progress [sic] your architect is making
6              getting a design out to me for my
7              review?"
8              Do you see that?
9      A.    Yes.
10     Q.    Okay.  And then if we look above at
11  Mr. Kennard's e-mail, Mr. Kennard notes:
12             "Hi Rick,
13             "Good to talk to you again, there is not
14             much to update as you can see from the
15             attachment . . . " [sic]
16             Did I read that accurately?
17     A.    Yes.
18     Q.    Then he notes:
19             ". . . we are working on the Subaru store
20             because of the agreement with them, we
21             only have until December to complete the
22             updates to that store . . ." [sic]
23  And then his last part of that sentence says:
24             ". . . we will stay on time with the
25             construction agreement with both VW and

1        Audi."

2        Did that happen?

3    A.    No.

4    Q.    Okay.  Would you turn to Exhibit 20.

5    A.    (Witness complied.)

6    Q.    Okay.  Exhibit 20.  Can you tell me what this

7    is?

8    A.    It was an e-mail I sent to John Kennard just

9    checking on the status of the facility plans and a

10   reminder that they were obliged to send us preliminary

11   drawings, 30, 60, 90's; that we were obliged to -- or we

12   had the right to review and approve those before going

13   forward with final construction documents.

14   Q.    Okay.  And can you please read this e-mail to

15   us?

16   A.    Yes.

17        "John,

18        "I'm checking in on the status of your

19        Audi facility plans.  While the final

20        construction set is not due until

21        December 15th, the preliminary drawings

22        (typically referred to as 30 percent, 60

23        percent and 90 percent drawings) were to

24        be reviewed by Audi.  Let me know when we

25        can expect to see this first set."

1    Mr. -- Mr. Weidle testified about the Subaru settlement
2    agreement.
3         A.   Yes.
4         Q.   Okay.  Do you recall learning about the
5    Subaru settlement agreement, the Wackerli settlement
6    agreement with Subaru?
7         A.   Yes.
8         Q.   Okay.  And do you recall learning about the
9    proposal to relocate Volkswagen?
10        A.   I did, yes.
11        Q.   Okay.  Was that a concern to you?
12        A.   Absolutely.  Any proposed relocation of a
13   Volkswagen franchise requires our consent.  And we put a
14   significant amount of effort into analyzing any proposal
15   and making sure that the brand would be effectively
16   represented in that location.
17             Not all locations are appropriate to have a
18   Volkswagen dealership.  And so when we learned after the
19   fact that there was some commitment made to another
20   brand to relocate Volkswagen, that was a significant
21   concern.
22        Q.   Okay.  Was the commitment Wackerli had made
23   to construct a facility for Subaru a concern for
24   Volkswagen?
25        A.   Yes.  Well, I mean we had seen that they'd

1    had challenges which resulted in bankruptcy, and to --

2    we had general concerns on whether -- you know,

3    financially if they're investing so much in Subaru, what

4    would that mean for Volkswagen.  So there was

5    significant concern associated with all of that.

6         Q.   Okay.  And are you -- you're familiar with

7    some of the issues Mr. Weidle testified about, that

8    Volkswagen and Audi ultimately objected to the proposal

9    to relocate the Volkswagen and Audi brands?

10        A.   Yes.  We objected to the -- the proposed

11   relocation was significantly substandard in our

12   opinion.  It's a location that, all other things being

13   equal, we would have never approved to relocate there.

14        Q.   But ultimately Volkswagen did approve it?

15        A.   They did, yes.

16        Q.   Okay.  And it was approved as part of the

17   settlement agreement we reviewed earlier?

18        A.   Yes.

19        Q.   Okay.  Now, Mr. Ray, just so we're clear from

20   the Volkswagen perspective, what was your understanding

21   of what Volkswagen and Wackerli were agreeing to in that

22   settlement agreement?

23        A.   So in exchange for our -- for removal of the

24   objection and approval of the relocation to this

25   facility, that Wackerli would commit to providing a

1    facility that did meet our standards.  So -- the basic

2    tenet of the agreement as I understood it.

3        Q.    So Wackerli wanted to relocate the Volkswagen

4    franchise --

5        A.    Yes.

6        Q.    -- is that right?

7        A.    Yes.

8        Q.    And Volkswagen had a right under its dealer

9    agreement to object to that?

10       A.    Correct.

11       Q.    And Wackerli wanted to assume the Volkswagen

12   agreement in bankruptcy?

13       A.    Yes.

14       Q.    And was it your understanding that Volkswagen

15   had a right to object to that?

16       A.    Yes.

17       Q.    And that Volkswagen had -- in exchange for

18   the facility, had agreed it would withdraw that

19   objection?

20       A.    Yes.

21       Q.    And allow the relocation?

22       A.    And allow the relocation.

23       Q.    Before Wackerli went into bankruptcy when it

24   was operating at the old facility, had Volkswagen told

25   Wackerli that it had to -- that it would be required to

1    meet facility standards before there was this agreement?

2         A.    No.    They -- they were in that -- they had a

3    dealer agreement prior to any of our facility standards

4    and so in essence they were grandfathered in, and we had

5    not expressed that requirement to them.

6         Q.    Okay.    So the issue of -- or the facility

7    commitment, that came up in the course of resolving the

8    dispute in the bankruptcy?

9         A.    Yes.

10        Q.    Now, do you remember -- were you involved in

11   any conversations around this time, let's say, before

12   the settlement agreement was entered into, with the

13   Wackerli organization about their facility?

14        A.    Yes.    I -- I went -- I'm getting -- make sure

15   the dates are straight.    But I did travel to Idaho

16   Falls, met with Mr. Wackerli to take a look at this

17   proposed facility.

18        Q.    Okay.    And did you meet with anybody other

19   than Mr. Wackerli?

20        A.    I met with Steve Wackerli and I believe his

21   sister.    My recollection is not a hundred percent.

22        Q.    Okay.

23        A.    I was supposed to meet with Mr. Wareing, but

24   that meeting never occurred.

25        Q.    And do you recall what you discussed with

1 requirement of where lights are placed, so a duct can't

2 interfere with a light placement.

3        The reflected ceiling plan is, again, that

4 architectural set that drives the mechanical and the

5 sprinkling systems and a variety of things that are

6 within the ceiling.

7        And item No. 5 is a furniture plan, which

8 would be set up using our Ideal Image furniture vendor.

9 They have templates and codes for the different pieces.

10 They have sizes. They have locations where data and

11 power feeds come up.

12        They have some miscellaneous retail and

13 display elements. The highlight frame is one of them.

14 Reception desk, the desk, they have side tables, coffee

15 tables. So all of that furniture package from our

16 vendor needs to be incorporated into this set.

17     Q.   And of these five comments, how many of them

18 would need to be incorporated in order for the Wackerli

19 organization to obtain Volkswagen's approval for 60

20 percent construction drawings?

21     A.   All of these would.

22     Q.   Okay. Now, I'd like to jump ahead to

23 Exhibits 96 and 97 and to look at those together.

24     A.   Okay.

25     Q.   So Exhibit 96 is an e-mail from Paul Wareing

1    to Anthony Ray, Eric Weidle, and you dated January 3rd,

2    2012 and subject "New Building." It contains two

3    attachments.

4            And Exhibit 97 is an e-mail from Mr. Wareing

5    to Anthony Ray, Eric Weidle, and you dated January 3rd,

6    2012, subject "Wackerli Site Plan," and contains one

7    attachment.

8            Looking at Exhibit 96 first, what are the

9    attachments to this e-mail?

10       A.   Well, this is elevations and a floorplan.

11       Q.   And looking at Exhibit 97, what's the

12   attachment to that e-mail?

13       A.   Ninety-seven is really from -- looks like a

14   civil engineering drawing, and civil engineering is one

15   of the consultants I referred to earlier. It includes a

16   site plan, parking layout. It includes some storm

17   drainage, elevation, and grades. It's a typical civil

18   engineering drawing for a site.

19       Q.   Okay. Now, looking at the floorplan and the

20   elevations and the site plan together, would you

21   consider those drawings to constitute 60 percent

22   construction drawings?

23       A.   No.

24       Q.   Do they come close to being 60 percent

25   construction drawings?

1      A.    Well, no.  They're just a refinement, really,

2   of the 30 percent that we looked at earlier.  They made

3   some of the adjustments to the building shell material.

4   They made some adjustments to the floor plan in terms of

5   placement and location of cars and furniture.

6            So it's still really hovering around that 30

7   percent set.  But there's no finish schedules, details,

8   no RCP, the reflected ceiling plan.  There's no

9   mechanical -- MP&E, mechanical, plumbing, and electric

10  drawings.  So it's really just still at that 30 percent

11  level.

12     Q.    And are these drawings the last set of

13  drawings that you saw from the Wackerli organization?

14     A.    Yes.

15     Q.    Okay.  Looking at these drawings did you

16  believe, as of January 3rd, 2012 when you received them,

17  that it was possible for the Wackerli organization to

18  open a new facility by March 31st, 2012?

19     A.    I would think in 90 days that would be highly

20  unlikely, if not impossible.

21     Q.    Had everything gone perfectly from January

22  3rd forward, when do you think it was the earliest that

23  Wackerli could have completed a construction project on

24  this new facility?

25     A.    Late July, maybe August, somewhere in that

1      A.    I started working there in 1970, became the
2   dealer principal in 1985.
3      Q.    Okay.  For our edification, what is the
4   dealer principal?
5      A.    Dealer principal is the owner of record and
6   someone that's the dealer operator of a dealership.
7      Q.    Tell us how the VW/Audi and Subaru dealership
8   came to fruition.
9      A.    In 1989 the Volkswagen/Audi dealership became
10  available for sale because of the economic circumstances
11  because Volkswagen and Audi at that time were not very
12  desirable franchises and the current owner could not
13  continue to operate that facility, so we purchased that
14  facility.  And after we did, we moved Subaru and Isuzu
15  into that facility to make it an economically viable
16  facility.
17     Q.    Okay.  Did you have a Subaru/Isuzu franchise
18  before you purchased the Audi --
19     A.    Yes.
20     Q.    -- VW -- okay.
21           How long had you been operating that
22  franchise?
23     A.    Subaru/Audi?
24     Q.    Right -- or Subaru/Isuzu.
25     A.    We acquired Subaru in 1987.  We acquired

1   Isuzu I believe in about '78, '79, in that time frame.

2       Q.   Okay.  At the time that you purchased the

3   Audi/VW dealership was there -- I assume there was some

4   kind of existing facility where that was housed?

5       A.   Yes, there was.

6       Q.   Is that the same facility that's up on North

7   Holmes now?

8       A.   Yes, 2250 North Holmes.

9       Q.   Okay.  How old was that facility at the time?

10      A.   It was built in 1982.

11      Q.   Was it built, to your understanding, as an

12  Audi/VW facility?

13      A.   Yes.  It was built according to one of their

14  facility standards at that time.

15      Q.   And what was involved in moving in

16  Subaru/Isuzu when you decided to merge them into the

17  same facility?

18      A.   The reason we did that is to be able to make

19  the dealership more viable economically and

20  profitability wise at that time.

21      Q.   Okay.  But did you have to go through any

22  kind of process with -- on the German side versus the

23  Japanese side to get them to live in harmony?

24      A.   No.

25      Q.   Now, the VW/Audi -- first of all, what was