EXHIBIT N

**BEFORE THE IDAHO TRANSPORTATION DEPARTMENT**

**STATE OF IDAHO**

| | | |
|---|---|---|
| IN THE MATTER OF THE PROTEST | ) | |
| OF NOTICE OF FRANCHISE | ) | |
| AGREEMENT TERMINATION: | ) | |
| | ) | **FINDINGS OF FACT, CONCLUSIONS** |
| B.A. WACKERLI CO., Franchisee. | ) | **OF LAW AND PRELIMINARY ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| VOLKSWAGEN OF AMERICA, INC., | ) | |
| Franchisor. | ) | |

THIS MATTER came on for hearing on April 25, 2012. It was consolidated for hearing with the matter captioned *"In the Matter of the Protest of Franchise Agreement Termination: B.A. Wackerli Co., Franchisee v. Audi of America Inc., Franchisor."* Witnesses for each of the parties testified and VW/Audi Exhibits 1-134 were offered and admitted into evidence as were Wackerli Exhibits A through R.

The hearing officer, was appointed by the Director of the Department of Transportation to preside in this matter, conduct a hearing, take evidence, and submit proposed findings of fact, conclusions of law, and a preliminary order to the Director. The hearing officer having now reviewed the documentary exhibits admitted, heard the testimony presented in person and reviewed the transcripts of the same, and having considered the matter herein, being fully advised in the premises and the law, makes the following proposed:

## FINDINGS OF FACT

1. B.A. Wackerli Co. (Wackerli) and Volkswagen of America, Inc. (VWoA) are parties to a dealer agreement dated June 30, 1998 (" VW Dealer Agreement."). (Ex. 103). Wackerli is also

party to separate dealer agreements with Audi of America (AoA) (Exhibit 104) and Subaru of America, Inc. (Subaru). In 2009 Wackerli operated a multi-branded dealership at 2250 North Holmes, Idaho Falls, Idaho selling vehicles for VWoA, AoA, and Subaru out of the same facility.

2. The dealer agreement between Wackerli and VWoA approved the 2250 North Holmes location for Wackerli's Volkswagen dealership. The agreement also provided that Wackerli could not relocate its Volkswagen dealership operations without prior written consent from VWoA and that it would be cause for termination of the dealer agreement if Wackerli were to change the location of its dealership premises without VWoA's prior written consent. (Ex. 103).

3. As a result of the severe impact an economic recession in 2008 had on Wackerli's auto sales and the consequent loss of it's line of credit to purchase vehicle inventory, Wackerli filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code in February 2009. At some point during the bankruptcy proceedings Paul Wareing, who had previously lent money to Wackerli, was approved to become a 20% owner of Wackerli. (Tr. 438-444).

4. In June 2009 during the course of the bankruptcy proceedings Subaru sought to terminate its dealer agreement with Wackerli. (Ex. 105). Subaru ultimately decided against terminating Wackerli as a dealer, choosing instead to enter into a September 2009 settlement agreement ("Subaru Settlement Agreement"). (Ex. 106). Subaru agreed not to terminate Wackerli's dealer agreement in exchange for: 1) Wackerli agreeing to displace the Volkswagen and Audi franchises from the shared facility at 2250 North Holmes; and 2) Wackerli agreeing to renovate the shared facility into an exclusive Subaru facility meeting Subaru's facility and image standards. (Ex.106, at Ex. A - Subaru Settlement Agreement).

5. Wackerli made its commitment to Subaru in the Subaru Settlement Agreement, including

its promise to displace Volkswagen and Audi from the premises, without first asking for or obtaining the consent of VWoA. Wackerli did not inform VWoA that it had agreed to displace Volkswagen and Audi until after the fact. (Tr. 278:4-10).

6.      Wackerli later requested bankruptcy court permission to authorize it to assume the VW and Audi Dealer Agreements and to allow it to relocate the Volkswagen and Audi dealerships to a used car store located a short distance away at 1400 North Holmes Avenue in Idaho Falls. VWoA and AoA objected to Wackerli's motion to assume citing concerns about Wackerli's ability to meet its obligations under the agreements, the sub-standard dealership facilities at the proposed relocation, and Wackerli's failure to provide notice or obtain consent for the relocation, *inter alia*. (Ex. 107)

7.      Wackerli, VWoA and AoA negotiated in an attempt to reach a settlement of this dispute before a bankruptcy court hearing on Wackerli's motion to assume that was held on March 31, 2010. They reached a tentative settlement that day and submitted an outline of their agreement to the bankruptcy court. In a document titled "Outline of Settlement" Wackerli (as Debtor), VWoA, and AoA, through counsel, represented to the bankruptcy court, among other things, that: "The parties agree to a temporary relocation of the VW/Audi show room facility to 1400 North Holmes. Within the earlier of 18 months from the date of confirmation or two years from March 31, 2010, the Debtor shall complete an Audi/VW dual brand facility meeting VW/Audi minimum facility standards. If Debtor fails to complete the construction of the facility within the time frame specified above, it shall be deemed a material breach and the Debtor consents that said breach shall constitute good cause for termination of the dealer agreements." (Ex. 14)

8.      The Settlement Agreement was not finalized that day because the parties wanted to obtain additional information that would enable Wackerli to analyze the costs of building a new

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER -3

VW/Audi facility to current standards and to provide VWoA and AoA confidence that Wackerli knew what they were getting into when they agreed to relocate and build a new facility meeting the standards of each manufacturer. The attorney for VWoA and AoA, expressed their concerns to the bankruptcy court on March 31, 2010 as follows:

> Based on our discussions this morning, what I indicated to Mr. Maynes [Wackerli's counsel] was, if we have a confidence level, which I think we can get within the next two to three weeks, that they know what they're getting into when they say we're going to relocate and build you a new facility, we're prepared to enter into a relocation agreement.
> . . .
>
> I had indicated to Mr. Maynes that I think we could come up with the tentative terms of a deal within the next couple of days. The issue is if we feel comfortable that they've thought through what this is going to cost them, and we're convinced of that, which might take, you know, a week or two longer, we would be prepared to execute that agreement. However, it's really a confidence level. It's more of a due diligence rather than what the terms of that agreement would be.
> . . .
>
> The real issue is they have to be absolutely certain that they want to do this and absorb those costs which they're going to -- they're looking at what they -- they're getting cost estimates of what this is going to be. Before they finally sign it -- I -- and before we finally sign it, I think everyone wants to be comfortable that this is what they want to do...
> (Ex. 134).

9.     Wackerli through its counsel, Robert Maynes, stated that Wackerli would provide VWoA and AoA with financial information relating to the new facility. The following Monday, April 5, 2010, Mr. Maynes sent an e-mail to counsel for VWoA and AoA that stated: "Attached is the requested *pro forma* for the relocated VW/Audi franchises at 1400 N. Holmes." The *pro forma* Maynes sent included Wackerli's projected revenues and operating expenses through December

2013. (Ex. 15). VWoA and AoA reviewed the *pro forma* and found Wackerli's projections to be reasonable, conservative and achievable. Both VWoA and AoA entered into the Settlement Agreement with Wackerli. (Exhibit 1).

10.     The parties disagree on the meaning and intent of the projections in the *pro forma*. VWoA and AoA contend that the projections were provided to establish that Wackerli had done its due diligence prior to the execution of the Settlement Agreement and projected the costs and expenses to operate the dual dealerships in the existing used car facilities at the new location until no later than March 31, 2012, then to operate in a newly constructed facility at that location that met the current standards of both manufacturers. The *pro forma*, VWoA and AoA contend, was required by them prior to signing the Settlement Agreement to assure that Wackerli had done its due diligence and counted the cost of providing a new dual branded facility compliant with their latest facility standards. (Tr. 62-66) Wackerli, through the testimony Paul Wareing, took the position that the *pro forma* provided to VWoA and AoA was intended to establish projected operating income and expenses for operating the VW/Audi dealerships at 1400 North Holmes in the existing used car facility and did not attempt to project the operating income and expenses of a new dual branded facility built to current standards. Wareing's testimony indicated that the expenses and income needed to operate a new facility that would meet both manufacture's standards (costing between 1.5 and 2 million dollars to construct) would significantly exceed those in the *pro forma*. He testified that the inventory and income numbers in the *pro forma* would never support a new facility and never were intended to. (Tr. 532-548).

11.     The evidence presented establishes that the *pro forma* was prepared by Wackerli and provided by Wackerli to VWoA and AoA as part of the negotiations to settle the objections to the motion to assume the dealerships agreements. The *pro forma* was intended to establish

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER -5

Wackerli's projected operating income and expenses during the period that a new facility was being constructed and from March 31, 2012, or before, in the new facility through December 2013. The evidence presented by Wackerli to the contrary is not credible and runs counter to logic and the contemporaneous evidence surrounding the negotiations leading to the Settlement Agreement. That Wackerli, presumably upon closer inspection and at least several months after the *pro forma* were provided, found the figures projected in the *pro forma* unrealistic is not justification for non-compliance with the Settlement Agreement and is not attributable to the conduct or representations of VWoA or AoA.

12.    Following receipt of the *pro forma* projections Wackerli's motion to assume and VWoA and AoA's objections were resolved in an April 28, 2010 Settlement Agreement. The agreement was reached after weeks of arm's length negotiations, on site meetings, and information sharing in which each party was represented by legal counsel. VWoA and AoA agreed to drop their objections to Wackerli's motion to assume and agreed that Wackerli could assume the existing Dealer Agreements and remain a dealer post-bankruptcy. VWoA and AoA also agreed that Wackerli could temporarily relocate its Volkswagen and Audi operations to Wackerli's used car store at 1400 North Holmes. In consideration of VWoA and AoA's agreements, Wackerli agreed to construct a new dual-branded dealership facility for Volkswagen and Audi at the new location of 1400 North Holmes that would meet both brands' current facility standards. (Ex. 1; Tr. 58:2-59:7, 279:6-281:9).

13.    Wackerli agreed that the new facility would be completed by the earlier of: (a) 18 months after bankruptcy court approval of Wackerli's plan of reorganization, which became June 29, 2010 making the date for completion December 29, 2011(Exhibit 108); or (b) March 31, 2012. As part of the Settlement Agreement the attached dealer premises addenda provides that

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER -6

Wackerli is authorized to operate a sales facility at 1400 North Holmes and a service facility at 1363 North Holmes until March 31, 2012, but that "in no event shall debtor [Wackerli] be permitted to carry out Volkswagen or Audi operations at the Temporary Sales Facility or the Temporary Service Facility after March 31, 2012." (Ex. 1).

14.     The parties agreed in the VW Facility Construction Agreement appended to the Settlement Agreement that "If, by the Completion Date, Dealer fails to complete construction of the White Frame Facility in accordance with the construction drawings or revised construction drawings approved by VWoA. . . or if Dealer fails to comply with any other term or condition of this Addendum, then VWoA may terminate the Dealer Agreement of which this Addendum is a part. . . Dealer acknowledges that, in that event, VWoA would have good cause for terminating or failing to renew the Dealer Agreement and would be acting in good faith in doing so." (Ex. E to Ex.1)

15.     The Settlement Agreement also contained: (1) A "time is of the essence" clause (Ex. 1 Para. 17); (2) Language stating that any and all agreements and obligations assumed in the Settlement Agreement are "in connection with the settlement of a bona fide dispute and are entered into, assumed or relieved, as applicable, freely and without duress or coercion and are made in that Party's sole discretion" (Ex. 1, Para. 18); (3) A representation by Wackerli that it has "taken all necessary actions required to be taken to authorize it ...to perform all of its obligations, undertakings, and agreements to be observed and performed by it" under the Settlement Agreement (Ex. 1, para. 7(c)); (4) A warranty that the consummation of the transactions contemplated under the Agreement would not constitute a violation of any statute applicable to Wackerli (Ex. 1, para. (e)); and (5) A representation and agreement that the Settlement Agreement and the exhibits attached to it constitute the entire agreement and

understanding between the parties (Ex. 1, para. 11).

16. The Settlement Agreement did not contain any language or agreements regarding vehicle inventory or allocation or changing the terms of the existing dealer agreements regarding the allocation of vehicles by VWoA or AoA to Wackerli. Other than the sales projections Wackerli provided in the *pro forma* there was no documentary evidence presented to establish that the allocation of vehicles by VWoA to Wackerli or the number of vehicles that Wackerli would need in inventory to support a new facility were guaranteed, agreed upon, or even topics of discussion during the negotiations leading up to the settlement agreement.

17. VWoA and AoA have outside architectural firms that work with their dealers on developing facility designs that meet their facility standards. The architectural firm for VWoA is Cityscape and for AoA it is CR Studio. Cityscape and CR Studio's fees are paid by the dealer who is engaging in the facility project. Although the VW Facility Construction Agreement (Ex. E appended to the Settlement Agreement) specifically contemplated that Wackerli would enroll to use the design services of Cityscape, Wackerli decided shortly after signing the Settlement Agreement that it did not want to pay these fees. (*See* Tr. 124:13-125:14). Wackerli decided to do its own design work. At the urging of the bankruptcy court VWoA and AoA agreed. (Tr. 81-82).

18. The process of building a new dealership facility project typically proceeds in three phases: design, planning, and construction. The design phase begins with the preparation of the three basic preliminary design drawings a site plan, a floor plan, and elevations and ends with delivery of a Design Criteria Document, known as a "DCD book," to the dealer. The DCD book includes all design drawings necessary for the dealer's architect to create construction drawings. The design process is collaborative, could take several weeks or longer and involves several

iterations back and forth. Once the initial design drawings are agreed to, the outside architects develop the DCD. The next step in the process is drafting of construction drawings by the dealer's architect. Construction drawings are prepared and submitted for review by VWoA and AoA in four stages, 30%, 60%, 90% and 100%. Producing the 60% construction drawings is the bulk of the work because they include, among other things, mechanical, electrical, and plumbing drawings, footing and foundation information, a more developed site plan, and landscaping requirements. The construction drawing phase is also a collaborative and iterative process with submissions by the dealer and comments from VWoA and AoA. At each stage either Cityscape, or VWoA's outside project management consultant, CBRE, or in the case of AoA, CR Studio, will review the drawings to make sure that they comport with the DCD. Upon completion and approval of 100% construction drawings, the dealer submits the drawings to the municipality in which the dealership is being constructed to obtain building permits. The total time for construction drawings and permitting often takes between four and six months to complete.

19.     Wackerli's decision not to retain Cityscape and/or CR Studio meant that Wackerli would be required to prepare and submit designs to VWoA and AoA, who would provide comments to Wackerli's submissions. Wackerli would then update its designs and provide them for further comment until it had designs that comported with VWoA and AoA facility standards. To assist Wackerli, VWoA and AoA provided sample materials to John Kennard who was the General Manager of Wackerli's VW/Audi dealership. (Exs. 16, 17). They also followed-up with Kennard on several occasions to check on Wackerli's progress and remind it of upcoming deadlines. (Exs. 17, 19, 20, 26).

20.     The evidence shows that Wackerli made no meaningful progress on the design or construction of a new VW/Audi facility for several months after signing the Settlement

Agreement. On June 23, 2010, in response to an e-mail from VWoA's Rick Van Hassel, Kennard the person in charge of the new facility project for Wackerli reported that there had been no progress made on the Volkswagen/Audi project, explaining that "we are working on the Subaru store because of the agreement with them, we only have until December to complete the updates to that store." (Ex. 19). Wackerli's lack of progress continued through 2010. VW and Audi made inquiries during that time period regarding the progress on the facility design. On September 29, 2010, Skip Redman at VWoA e-mailed Kennard to inquire about Wackerli's progress. In his e-mail to Kennard, Redman described the usual design process in which Cityscape/CR Studio provide a design that meets all of the design standards and offered to set up a design review within a few weeks. Kennard did not accept Redman's offer to engage Cityscape or CR Studio. He also rejected Redman's offer to provide a generic DCD. (Ex. 26).

21.     Wackerli submitted a basic floor plan and site plan, but no elevations, on September 20, 2010. VWoA provided initial comments to the floor plan and site plan on October 5, 2010 and AoA provided initial comments on October 22, 2010. Wackerli did not respond to these comments. Eric Weidle of AoA reminded Kennard on November 18, 2010 that Wackerli needed to submit drawings to both VWoA and AoA that reflected their comments to Wackerli's initial drawings and that provided a "more advanced level of detail." Weidle noted in his November 18, 2010 e-mail, that the date for submitting final construction drawings to AoA was December 15, 2010. When he received no response from Wackerli, Weidle sent a letter directly to Steven Wackerli, Wackerli's owner, on December 2, 2010, to remind him of Wackerli's commitments and to ask that Wackerli's obligations be made current. (Ex. 33). The evidence establishes that Weidle received no response to this letter. (Tr. 102:15-104:9). Weidle sent a January 11, 2011 letter, which notified Mr. Wackerli that his dealership had breached its promise to submit final

construction drawings by December 15, 2010 but again received no response. (Ex. 34; Tr. 104:12-105:20).

22.     On April 1, 2011 VWoA sent Wackerli a notice of default and on April 20, 2011 AoA sent Wackerli a notice of default. (Exs. 36, 37; Tr. 105:23-106:19, 309:15-310:6). There is no evidence in the record that Wackerli responded to either notice of default.

23.     Steven Wackerli testified in an affidavit filed in bankruptcy court in May 2011, that Wackerli "was proceeding with the relocation and new facility development until the fall of 2010 when it was evident that vehicle allocation was insufficient to support the ongoing expenses associated with the new facility development and construction." (Ex. 109). No documentary evidence was presented by either party to establish the context of the filing of the affidavit or the results it obtained but testimony indicated that Wackerli had sought the assistance of the bankruptcy court in enforcing Idaho law relating to dealership inventory guarantees, and that assistance was declined by the court in late July or early August of 2011. More importantly, Wackerli presented no documentary evidence establishing how it came to the conclusion in the Fall of 2010 that vehicle allocation from VWoA and AoA was insufficient to support the expenses associated with the new facility development and construction, or why that conclusion differed from the projections that they had previously provided to VWoA and AoA in the *pro forma* as an inducement to the execution of the Settlement Agreement. Wackerli did not present any documentary evidence that it had advised VWoA or AoA of its conclusions regarding vehicle inventory, of a request to VWoA or AoA for additional vehicle inventory, or for a written guarantee of sufficient inventory to support the construction of the new facility.

24.     Each of the Facility Construction Agreements appended to the Settlement Agreement contain a mechanism designed to give Wackerli an opportunity to petition for an extension of the

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER -11

deadlines in the agreements in the event that Wackerli anticipates that it will fail to meet a deadline due to reasons wholly outside of Wackerli's control. (Ex. E paragraph 6 and Exhibit F paragraph 3, appended to Ex. 1). There is no evidence in the record that Wackerli availed itself of or attempted to use these mechanisms when deadlines were not met due to Wackerli's concerns over vehicle allocation.

25.     Wackerli asserts in its closing brief that the issue of a written guarantee for sufficient inventory to support the expansion or construction of the dealership facility was raised as early as the Fall of 2009 and cites the hearing officer to Exhibits 1, 106, 107, and 108 in support of that assertion. However, nothing in any of the cited exhibits relates to the issue of a written inventory guarantee. Beyond the Steven Wackerli Affidavit and references in an email exchange between Paul Wareing and Anthony Ray in October and November 2011 (Exhibit M, pp. 117-121) there is no documentary evidence in the record of any discussion between the parties regarding vehicle allocation or guarantees.

26.     The evidence shows that Steven Wackerli's testimony about his dealership's vehicle supply in Exhibit 109 is incorrect. Wackerli testified in his affidavit that, in 2010, the dealership was allocated only 28 new Audi vehicles and 19 new Volkswagen vehicles. But Wackerli's 2010 Audi financial statement shows that it sold 39 Audis and ended the year with 6 in inventory. (Ex. 123). This means that Wackerli received 41 Audis into inventory in 2010, given that it ended 2009 with 4 in inventory. (Ex. 121). Exhibit N provided by Wackerli shows that Wackerli received 53 Volkswagen vehicles in 2010. This contradicts the testimony in the affidavit that Wackerli received 19 new VW vehicles in 2010. Wackerli's Exhibit N also shows that between March 2010 and March 2011, Wackerli sold off 32 Volkswagen vehicles to other dealers. Further, Wackerli's actual new vehicle sales exceeded Wackerli's pre-settlement

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER -12

projections from its *pro forma*. (Exs. 15, 122, 123, 124, 125).

27.     In August 2011 after the bankruptcy court denied its request to rule on the vehicle allocation issue Wackerli renewed contact with VWoA and AoA regarding the construction of a new facility. At this point it was Paul Wareing that began communicating with VWoA and AoA on behalf of Wackerli rather than Mr. Kennard. Wackerli's self initiated renewed interest in constructing the facilities came despite the lack of a written guarantee or other new agreements on vehicle allocation or inventory. At the time contact was renewed Wackerli had failed to meet several of the intermediate deadlines in the facility addenda to the Settlement Agreement, including the October 30, 2010 deadline for submitting design drawings to VWoA, the January 15, 2011 deadline for submitting construction drawings to VWoA, the December 15, 2010 deadline for submitting construction drawings to AoA, and the March 31, 2011 deadline for beginning construction. (Ex. 1, E1-E2, F1). The evidence established that as of August 2011 it was highly unlikely, perhaps even impossible, for Wackerli to complete design, planning and construction of the facility by March 31, 2012. However, Wareing, in an e-mail dated September 13, 2011, stated that Wackerli intended to complete construction by March 31, 2012. (Ex. 48). Wareing testified that if Wackerli had begun construction in August 2011, it could have completed the facility by March 31, 2012. (*See* Tr. 546:24-547:14). The evidence shows that Wackerli was not in a position to start construction in August 2011 because it did not have basic design drawings prepared by that time let alone approved final construction drawings. Clint Sly, an experienced project manager who has handled hundreds of dealer facility construction projects testified credibly that, if everything had gone perfectly, Wackerli possibly could have finished the project by August 2012. But he also testified that he has never seen everything go perfectly on a construction project. (Tr. 422:12-424:7).

28.     Wackerli submitted a proposed floor plan, but not a site plan or elevations, on October 13, 2011 (Ex. 59). On October 28, 2011 Wackerli submitted proposed, but incomplete, elevations. (Ex. 68). Wackerli did not submit a site plan until December 12, 2011. (Ex. 89). Once Wackerli submitted plans, VWoA and AoA commented on them in a timely manner. This submission for review was part of the process agreed to in the facility addenda as modified for Wackerli and did not constitute stonewalling, impairing or impeding Wackerli's attempt to construct a facility. (Exs. 43, 61, 63). The purpose of the comments was to arrive at facility designs that comported with VWoA and AoA's facility standards.

29.     Wackerli did not retain its own architect for the project, its design submissions being prepared by a drafter without the supervision of a trained and licensed architect. (Tr. 566:1-23). Wackerli was using Wareing as the general contractor on the new dealership facility. (Tr. 561:24-562:9). (Ex. 89).

30.     Paul Wareing testified on behalf of Wackerli that, in his opinion, VWoA and AoA were "humoring" him and that they did not want Wackerli to complete the facility when Wackerli renewed the communication process about the new facility in August 2011. (Tr. 543:1-544:21). The record shows however that VWoA and AoA provided Wackerli information about their facility standards both before and after the parties entered into the Settlement Agreement, timely provided comments to Wackerli's single submission in 2010 and its later submissions in late 2011, reminded Wackerli of its obligations when submission dates approached, made their architects available to work with Wackerli on its facility design, and at their own expense, asked CR Studio and Clint Sly, a third-party project manager for VWoA, to assist Wackerli.

31.     As the deadline for Wackerli's completion of construction of the facility approached and it became increasingly clear that it would not be possible for Wackerli to meet the construction

deadline, VWoA and AoA were placed in a difficult position in their interactions with Wareing and Wackerli. While they continued to respond to inquiries, provide information and assistance as requested and comment on plans that were presented, they were also firm about the impending deadlines, the risks of proceeding before approved is obtained, and the fact that the dates for fulfillment of the contractual obligations would not be extended. This is demonstrated in the communications in late November and early December 2011 between VWoA and Wareing about the purchase of the steel package for the new facility. (Ex. M, pp. 169-198). Wareing, at a point where the submitted construction drawings are at best at a thirty percent (30%) level of completion, asks for the "OK" from AoA and VWoA to start construction on the shop building and to pour the footings and foundation for the shop and showroom. VWoA responded that they cannot tell Wackerli to proceed with construction or ordering of steel. It is made clear that would be Wackerli's decision and done at Wackerli's risk. VWoA reaffirmed that it would review the 60%, 90% and 100% construction drawings for compliance when received, but that a complete set of construction drawings must be reviewed before a project will be approved to proceed.

32. By January 2012 Wackerli had not advanced its facility project beyond the preliminary design phase. (*See* Tr. 420:22-422:14). Wackerli, had not yet developed final construction drawings, obtained building permits, or broken ground on a new facility. By January 2012 it was not possible for Wackerli to finish its facility project by March 31, 2012. Wackerli had therefor breached its facility commitment. VWoA and AoA decided to terminate Wackerli's Volkswagen and Audi Dealer Agreements and issued the requisite statutory notices. (Exs. 100, 101). These notices were the last in a series of written communications in the record in which VWoA and AoA notified Wackerli of its failure to comply with its obligations under the Settlement

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER -15

Agreement. (Exs. 33, 34, 36, 37, 46, 54, 58, 69).

33.     In its notice of termination VWoA also stated that Wackerli had breached its new vehicle

sales obligations to VWoA in view of its deficient performance. Article 5(1) and 5(2) of the

Volkswagen Dealer Agreement Standard Provisions provide:

> Dealer will use its best efforts to promote the sale of Authorized
> Automobiles in Dealer's Area, through regular contacts with
> owners, users, and prospective owners and users of Authorized
> Products; through promotion, prospecting, and follow-up
> programs; and through such means and at such levels as may be
> indicated from time to time by the Operating Standards, Operating
> Plan and Recommendations.
>
> Dealer will achieve the best sales performance possible in Dealer's
> Area for each model and type of Authorized Automobile. The
> measurement for Dealer's yearly sales performance will be the
> objective established in the applicable annual Operating Plan.

VWoA maintains that it has good cause to terminate Wackerli based on its deficient vehicle

sales. The evidence shows that Wackerli's sales performance declined in 2008 and that it has

remained one of the lower performers in the VWoA Western Region since then. However, given

the subjective nature of the language in paragraphs 5(1) and 5(2) of the VW Dealer Agreement

Standard Provisions regarding sales efforts the evidence presented does not support a finding that

Wackerli's sales performance constituted a breach of the agreement. VWoA admitted as much

at the hearing through the testimony of Anthony Ray, who, when asked whether VWoA would

have terminated the Wackerli franchise agreement on sales performance alone if Wackerli had

constructed a new facility as agreed, stated:

> Q:  If the facility had been built by March 12th -- or excuse me --
> March 31st of 2012, would you have still attempted to terminate
> the dealership agreement just based upon sales performance?
>
> A:  Not at that time. We would have given the dealer a chance to

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER -16

perform in the new location with the proper representation. We
believe part of their sales under-performance is as a result of their
poor representation of the brand. (Tr. 330:2-10)

## CONCLUSIONS OF LAW

1.      Idaho Code §49-1614 governs the termination of motor vehicle dealership franchise

agreements. Pursuant to Idaho Code §49-1614(1), a manufacturer may not terminate a dealer's

franchise agreement unless it provides notice, as outlined in the statute, and has good cause for

termination. VWoA and AoA are distributors, not manufacturers, but the statute is applicable to

them as the distributors for a manufacturer.

2.      Idaho Code Section 49-1614(2) provides that, for a termination of the type involved in

this case, a manufacturer must provide notice by certified mail at least 90 days prior to the

effective date of termination. The notice must contain the information identified in §49-1614(3),

which includes a statement of intention to terminate, a statement of reasons for termination, and

the date on which termination is to take effect.

3.      The Notices of Termination served by VWoA and AoA complied with Idaho Code §49-

1614.

4.      Idaho Code Section 49-1617(1) provides that a dealer may protest termination and:

> The manufacturer shall not terminate. . . until the department has
> held a hearing, nor subsequently, if the department has determined
> that there is not good cause for permitting the termination. . . or
> that the manufacturer is not acting in good faith.

5.      Idaho Code §49-1614(4), defines "good cause" as follows:

> (4) Notwithstanding the terms, provisions or conditions of any
> franchise agreement or of any waiver, good cause shall exist for
> the purposes of a termination, cancellation or nonrenewal when
> there is a failure by the dealer to comply with a provision of the
> franchise agreement, where the provision is both reasonable and of
> material significance to the franchise agreement relationship, and

provided that the dealer has been notified in writing of the failure within one hundred eighty (180) days prior to termination, cancellation or nonrenewal. A protest may be filed in accordance with the provisions of section 49-1617, Idaho Code.

6.   Idaho Code §49-108(1), defines "good cause" as:

(1) "Good cause" means the failure of a dealer to comply with reasonable performance criteria established by a manufacturer, if the dealer was apprised by the manufacturer, in writing, of that failure; and (a) The notification stated that notice was provided of failure of performance; (b) The dealer was afforded a reasonable opportunity, for a period of not less than six (6) months, to comply with the criteria; and (c) The dealer did not demonstrate substantial progress toward compliance with the performance criteria of the manufacturer during the period.

7.   Pursuant to Idaho Code §49-1617(1), when a protest is filed, the Department has two issues to decide: 1) whether there is good cause to permit termination of a dealer agreement; and 2) whether the manufacturer failed to act in good faith.  Under Idaho Code §49-1614(6) a manufacturer seeking to terminate a franchise agreement based upon breach has the burden of proving that the dealer failed to comply with a provision of the franchise agreement that is both a reasonable provision and one that is of material significance to the franchise agreement relationship.

8.   Under the language of the Settlement Agreement Wackerli specifically agreed that if it failed to meet its commitment to construct a new facility by the agreed upon date, good cause would exist for the termination of the dealer agreement. Wackerli also agreed in the Settlement Agreement that its commitment to build a new dealership facility by a date certain was reasonable and of material significance to the franchise agreement relationship.

9.   Wackerli's agreement that good cause would exist in the event of a breach of its facility commitment constituted a material part of the consideration that VWoA and AoA bargained for in negotiating the Settlement Agreement. Under Idaho law, courts (and thus executive branch

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER -18

agencies acting in a quasi-judicial role) are not permitted to read bargained-for consideration out of an agreement.

10.     Independent of Wackerli's specific agreements on reasonableness, the evidence established that the facility commitments were a reasonable provision of the franchise agreements. Dealers represent to the public the brands they sell and the quality of dealership facilities directly affects the image and public perception of the brand, and thus the sale of motor vehicles. The evidence of Wackerli's fulfillment of its facility commitments to Subaru, even though it meant displacing VWoA and AoA from its existing facilities and contravening the terms of the original dealer franchise agreements with VWoA and AoA, demonstrates that it understood and accepted the importance and reasonableness of the facility commitments and constructing to a manufacturer's facility standards. In consideration of Wackerli's facility commitment VWoA and AoA approved Wackerli's temporary relocation into an inferior facility. Wackerli had placed itself in a double bind by making the agreement with Subaru. VWoA and AoA, despite not being notified or consulted by Wackerli at the outset, agreed to let Wackerli out of its self-created bind and accept the relocation of their dealerships to an inferior facility for a temporary period. They agreed to do this despite their concerns that the temporary facility was "a step backwards" to an older facility that was not appropriate for operations long-term. Wackerli's facility commitments were a reasonable inducement and constituted valuable consideration for VWoA and AoA's agreements to accept the inferior location on a temporary basis.

11.     Independent of Wackerli's specific agreements on materiality, the facility commitments were also of material significance to the franchise relationship. The purpose of the Settlement Agreement from VWoA and AoA's perspective was to obtain a commitment from Wackerli to

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER -19

construct a new facility compliant with current standards by a date certain. To memorialize Wackerli's commitment, the parties amended the Dealer Agreements to incorporate the facility construction agreements. VWoA and AoA only consented to Wackerli assuming the dealer agreements in their amended form. Both parties expressly represented to the bankruptcy court that failing to timely construct a facility would be a material breach. (Ex. 14). Wackerli's facility commitments were an important and essential benefit of both the Settlement Agreement and the Dealer Agreements, as they were amended and assumed in bankruptcy, and are therefore of material significance to the franchise relationship.

12.     VWoA has met its burden of establishing good cause under both statutory definitions cited above for the termination of the dealer franchise agreement with Wackerli based upon Wackerli's failure to comply with a provision of the franchise agreement which is both reasonable and of material significance to the franchise agreement relationship. Wackerli was notified in writing of the failure to comply or perform at least one hundred eighty (180) days prior to the termination. The notification stated that notice was provided of failure to comply or perform. Wackerli was afforded a reasonable opportunity, for a period of not less than six (6) months, to comply with the agreement but did not demonstrate substantial progress toward compliance with the performance criteria of the manufacturer during the period.

13.     Idaho Code Section 49-1617(1) provides that (t)he manufacturer shall not terminate. . . if the department has determined. . . that the manufacturer is not acting in good faith. The burden to prove lack of good faith is on the dealer.

14.     In addition to the statutory requirements on a manufacturer to act in good faith the terms of the Dealer Agreement and the Settlement Agreement between Wackerli and VWoA include an implied covenant of good faith and fair dealing under Idaho law. The purpose of the implied

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER -20

covenant of good faith and fair dealing is to ensure that both parties to a contract, in performance of the contract deal with each other in good faith so as to not inhibit or render impractical or impossible the performance of the contract by the other party. The burden to prove a breach of the implied covenant of good faith and fair dealing is on Wackerli.

15. Wackerli maintains that VWoA and AoA have not acted in good faith under Idaho Code Section 49-1617 and have breached the implied covenant of good faith and fair dealing for the following reasons: (1) They failed to provide Wackerli a written guarantee of a sufficient supply of new vehicles so as to justify the construction of the new dual-branded facility, in light of the market and economic conditions; (2) They failed to provide vehicles in the proper numbers, colors and mix of models to make construction of the new facility economically viable; and (3) They put unnecessary, and in some instances trivial, road blocks in Wackerli's path to getting the design approval and beginning construction of the facility as required by the Settlement Agreement.

16.     Idaho Code §49-1613(2)(j) provides in pertinent part: It shall be unlawful for any manufacturer or distributor licensed under this chapter to require, attempt to require, coerce, or attempt to coerce any new vehicle dealer in this state to make significant modifications to an existing dealership or to construct a new vehicle dealership facility without providing a written guarantee of a sufficient supply of new vehicles so as to justify modification or construction, in light of the market and economic conditions.

17.     Idaho Code §49-1613(2)(j) applies in circumstances where a manufacturer "requires" or "coerces" a dealer to construct a new facility. VWoA and AoA did not coerce or require Wackerli to commit to building a new facility. The facility commitments Wackerli made to VWoA and AoA were reached in arms-length negotiations between sophisticated business

FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER -21

entities represented by legal counsel. VWoA and AoA provided valuable consideration, their consent to Wackerli assuming the dealer agreements in bankruptcy and to the temporary relocation of dealerships to the inferior location at 1400 North Holmes, in exchange for a facility commitment. This negotiation and the ultimate Settlement Agreement that was reached was necessitated by Wackerli's bankruptcy filing and the terms of the settlement agreement Wackerli reached with Subaru. The evidence does not support a conclusion that VWoA or AoA either required or coerced the facility commitments from Wackerli. The written guarantee provisions of Idaho Code 49-1613(2)(j) do not apply under the facts of this case. Any failure or refusal of VWoA and AoA to provide Wackerli a written guarantee of a sufficient supply of new vehicles so as to justify modification or construction in light of the market and economic conditions under the circumstances of this case does not constitute a lack of good faith.

18. The evidence does not support a finding that VWoA or AoA had an obligation to or failed to provide vehicles in the proper numbers, colors and mix of models to make construction of the new facility by Wackerli economically viable.

19.    The evidence does not support a finding of lack of good faith on the part of VWoA or AoA in the vehicle allocation procedures and policies they followed after the execution of the Settlement Agreement nor does the evidence support a finding that VWoA or AoA's vehicle allocation policies in performance of the Settlement Agreement inhibited or rendered impractical or impossible the performance of the Settlement Agreement by Wackerli.

20.    The evidence does not support a finding of lack of good faith on the part of VWoA or AoA in their dealings with Wackerli regarding the design or construction of the new dual-branded dealership facility after Wackerli re-started the process in August of 2011 nor does it support a finding that VWoA or AoA's actions or requirements in the facility design or

construction approval process inhibited or rendered impractical or impossible the performance of the Settlement Agreement by Wackerli.

## **PRELIMINARY ORDER**

Based upon the proposed Findings of Fact and Conclusions of Law set forth above the hearing officer enters the following preliminary order subject to the terms and conditions set forth in Appendix A, which is attached and made a part of this preliminary decision;

Good cause to terminate the dealer franchise agreement between B.A. Wackerli Co. and Volkswagen of America Inc. and the existence of good faith in such termination having been established by Volkswagen of America Inc., IT IS ORDERED that the Protest of Franchise Termination filed by B.A. Wackerli Co. with the Department on February 3, 2012 is DENIED.

DATED: June 8, 2012.

STEPHEN A. BYWATER
Hearing Officer

**CERTIFICATE OF SERVICE BY MAIL**

I HEREBY CERTIFY that I have this 8th day of June, 2012, served a true and accurate copy of the foregoing proposed **FINDINGS OF FACT, CONCLUSIONS OF LAW, AND PRELIMINARY ORDER** by depositing the same in the United States mail, postage prepaid, addressed to the following persons:

> B.A. WACKERLI CO.
> C/O MICHAEL D. GAFFNEY
> BEARD ST. CLAIR AND GAFFNEY
> 2105 CORONADO ST.
> IDAHO FALLS, IDAHO 83404
>
> VOLKSWAGEN OF AMERICA, INC.
> C/O STEPHEN R. THOMAS
> MOFFAT THOMAS
> P.O. BOX 829
> BOISE, IDAHO 83701-0829
>
> VOLKSWAGEN OF AMERICA INC.
> C/O STEVEN J. YATVIN
> OWEN H. SMITH
> BARAK FERRAZZANO KIRSHBAUM & NAGELBERG LLP
> 200 WEST MADISON STREET, SUIT 3900
> CHICAGO, ILLINOIS 60606

STEPHEN A. BYWATER
Bywater Law Office
P.O. Box 170399
Boise, Idaho 83717

# APPENDIX A

**THIS IS A PRELIMINARY ORDER OF THE HEARING OFFICER.** It can and will become final without further action of the Hearing Officer unless any party petitions for reconsideration to the Hearing Officer issuing this Preliminary Order or petitions for review to the Director.

Any party may file a petition for the Hearing Officer's reconsideration of this Preliminary Order within fourteen (14) days of the service date of this Order. The Hearing Officer issuing this Preliminary Order will dispose of the petition for reconsideration within twenty-one (21) days of its receipt, or the petition will be considered denied by operation of law. See section 67-5243(3), Idaho Code. (Parties should not combine a petition for reconsideration to the Hearing Officer with a petition for review to the Director. If a party wishes to petition the Director after receiving a ruling from the Hearing Officer on a petition for reconsideration, the petition to the Director should be filed according to the following provisions.)

Within fourteen (14) days after:
  (a) The service date of this Preliminary Order,
  (b) The service date of the Hearing Officer's denial of a petition for reconsideration from this Preliminary Order, or
  (c) The failure within twenty-one (21) days of the Hearing Officer to grant or deny a petition for reconsideration from this Preliminary Order, any party may in writing petition for review or take exceptions to any part of this Preliminary Order and file briefs in support of the party's position on any issue in this proceeding to the Director. Otherwise, this Preliminary Order will become a Final Order of the Department.

If any party petitions for review before or takes exceptions to this Preliminary Order to the Director, opposing parties shall have twenty-one (21) days to respond before the Director to the petition for review or exceptions. Written briefs in support of or taking exceptions to this Preliminary Order shall be filed with the Director. The Director may review this Preliminary Order on its own motion.

If the Director reviews this Preliminary Order, the Director shall allow all parties an opportunity to file briefs in support of or taking exceptions to this Preliminary Order and may schedule oral argument in the matter before issuing a Final Order. The Director will issue a Final Order within fifty-six (56) days of receipt of the written briefs or oral argument, whichever is later, unless waived by the parties or for good cause shown. The Director may remand the matter to the Hearing Officer for further evidentiary hearings if further factual development of the record is necessary before issuing a Final Order.

Pursuant to sections 67-5270 and 67-5272, Idaho Code, if this Preliminary Order becomes final, any party aggrieved by the Final Order or Orders previously issued in this case may appeal the Final Order and all previously issued Orders in this case to district court by filing a petition in the district court of the county in which:
  (a) A hearing was held,
  (b) The final agency action was taken,
  (c) The party seeking review of the Order resides, or
  (d) The real property of personal property that was the subject of the agency action is located.

The appeal must be filed within twenty-eight (28) days of this Preliminary Order becoming final. See section 67-5273, Idaho Code. The filing of an appeal to district court does not itself stay the effectiveness or enforcement of the Order under appeal.