EXHIBIT O

# BEFORE THE IDAHO TRANSPORTATION DEPARTMENT, IN THE STATE OF IDAHO

| | |
|---|---|
| IN THE MATTER OF THE PROTEST OF NOTICE OF FRANCHISE AGREEMENT TERMINATION:<br><br>B.A. WACKERLI CO., Franchisee,<br><br>vs.<br><br><br><br>VOLKSWAGEN OF AMERICA, INC., Franchisor, | B. A. WACKERLI CO.'S COMBINED PETITION FOR RECONSIDERATION OF THE HEARING OFFICER'S PRELIMINARY ORDER[1] |
| IN THE MATTER OF THE PROTEST OF NOTICE OF FRANCHISE AGREEMENT TERMINATION:<br><br>B.A. WACKERLI CO., Franchisee,<br><br>vs.<br><br>AUDI OF AMERICA, INC., Franchisor, | |

The franchisee and petitioner, B.A. Wackerli Co., hereby petitions the Hearing Officer to reconsider the Findings of Fact, Conclusions of Law and Preliminary Orders served June 8, 2012.

In particular, the petitioner asserts that the conclusions of law are incorrectly drawn from the findings of fact and/or unsupported by existing contract principles. The petitioner requests that the Hearing Officer reconsider its conclusion of law that Idaho Code §49-1613(2)(j) "does not apply to the facts of this case" and is a material part of the

---

[1] This petition addresses both of the Findings of Fact, Conclusions of Law and Preliminary Orders issued on June 8, 2012 with regard to the franchisors Audi of America, Inc. and Volkswagen of America, Inc.
B.A. Wackerli Co.'s Combined Petition for Reconsideration of the Hearing Officer's   1
Preliminary Order

subject Settlement Agreement between the parties. The petitioner further requests that the Hearing Officer reconsider its conclusions of law that per paragraph 16 "the evidence does not support a finding that VWoA or AoA had no 'obligation to provide vehicles in proper numbers, colors and mix of model to make construction of the new facility by Wackerli economically viable.'" It is the petitioner's assertion that such a conclusion of law by the Hearing Officer renders the Settlement Agreements between the parties illusory and unenforceable.

Finally, the petitioner asserts that the conclusion of law contained in paragraph 19 that the evidence does not support a finding of lack of good faith on the part of VWoA or AoA in the vehicle allocation procedures and policies followed "inhibited or rendered impractical or impossible the performance of the Settlement Agreement by Wackerli" against the clear weight of oral testimony presented by Wackerli and unrebutted by the franchisors at the time of the hearing.

**1. Conclusion of Law 17, holding that BA Wackerli was not required to expand its facilities, make significant modifications to an existing dealership or to construct a new vehicle dealership was "not required of Wackerli by both Volkswagen or Audi pursuant to the Settlement Agreement" is an incorrect application of basic contract law.**

Conclusion of Law 17 focuses on negotiation of the Settlement Agreement stating that it was a "arms length" transaction between "sophisticated business entities represented by legal counsel." The additional conclusion that "VWoA and AoA provided valuable consideration, their consent to Wackerli assuming the dealer agreements in

bankruptcy" begs the question of what conduct Wackerli was *required* to perform under the Settlement Agreement.

It is Wackerli's position that the conclusion that the franchisors provided no valuable consideration for the Settlement Agreement beyond that which they were already required to provide under the extant dealership agreements. In exchange for the *requirement* in the Settlement Agreement that Wackerli build a new facility VWoA and AoA were required to do nothing that they were not already required to do under the original Dealer Agreements. There is no evidence in the limited record that the bankruptcy court, as part of the chapter 11 reorganization plan, had negated or otherwise rendered unenforceable the preexisting Dealer Agreements between the franchisors and Wackerli. In fact, the evidence before the department demonstrates that the franchisors merely filed an objection to Wackerli's motion to assume executory contracts. Exhibit 107. There was no adjudication of this motion. At the time this motion was filed, and more importantly, at the time the franchisors entered into the Settlement Agreement, the dealership agreements between the franchisors and Wackerli were still enforceable in their entirety. Thus, Wackerli asserts that paragraph 17 of the Conclusions of Law incorrectly characterizes the franchisors agreement to "allow" Wackerli to assume the existing dealership agreements in error.

The Settlement Agreement creates an absolute *requirement* on the part of Wackerli to expand, significantly modify and construct a new vehicle dealership as a precondition to continued ability to operate under the extant dealership agreements. It is Wackerli's contention that the Hearing Officer is confusing Wackerli's "requirement" to enter into the Settlement Agreement with Wackerli's requisite required duties *under* the

Settlement Agreement. Wackerli contends that the logic that because Wackerli was free not to enter into the Settlement Agreement, and thus would not be "required" to build a new facility as a condition of continued operation under the dealership agreements, completely misses the point under basic contract principles. Obviously, any party is free to decline to enter into a contract in the abstract. However, Wackerli already was operating under the Dealer Agreements a business that comprises 40% of its revenue. The franchisors' leveraging the bankruptcy as a condition to create what amounts to inserting a new provision into the existing agreements, does not constitute "new consideration." The involvement of the bankruptcy court was fortuitous insofar as the bankruptcy had nothing to do with the dealer agreements between Wackerli and the franchisors but, rather, simply created a situation where in essence, the franchisors came to Wackerli and said that as an additional *requirement* of continued operation under the *existing* dealer agreements, Wackerli "shall complete construction of a new VW/Audi dual brand dedicated sales and service facility on the property located 1400 N. Holmes Avenue."

It is Wackerli's position that the Settlement Agreement was not a new contract between the parties, but rather a modification to the existing dealer agreements. This is confirmed by the fact that the only new condition imported into the existing dealer agreements was the *requirement* that Wackerli build a new dual brand facility. And, as noted under this modification to the existing dealer agreements, the franchisors were required to *do nothing*.[2]

---

[2] As discussed below, interpretation of paragraph 18 of the Conclusions of Law literally reiterate this point.

Wackerli submits that it was absolutely required under the existing dealer agreements to expand, modify or build a new facility at the insistence of the franchisors. Because of this, Idaho Code §49-1613(2)(i)(j) as incorporated into the agreement, required the franchisors to provide written guarantees that a "sufficient supply of new vehicles so as to justify an expansion" was a material requirement to the continued dealer agreement between the franchisors and Wackerli. The record is clear and undisputed that the franchisors failed to provide this written guarantee. The Conclusions of Law cite no authority for the proposition that a contractual provision requiring a party to act in a certain way does not constitute the requisite "requirement" to act in a certain way as contemplated by the statute. In fact, under the Hearing Officer's analysis in paragraph 17 of the Conclusions of Law, the only circumstances under which the statutory provision would apply would be an adhesion contract or an attempt to unilaterally *modify* an existing contract by the franchisor without negotiating the agreement with the franchisee. Wackerli submits that both of these types of contracts would be unenforceable *ab initio*.

**2. Conclusion of Law 18 misinterprets the Dealer Agreements and renders the agreements illusory.**

The Hearing Officer states in Conclusions of Law, paragraph 18 that:

The evidence does not support a finding that VWoA or AoA *had an obligation to...* to provide vehicles in the proper numbers, colors and mix of models to make construction of the new facility by Wackerli economically viable. (emphasis added)

Under the Volkswagen Dealer Agreement (Exhibit 103, Article 8(4)) VWoA is required to "endeavor to make a fair and equitable allocation and distribution of ... authorized products" available to the dealer. Authorized products are defined as "authorized automobiles." Exhibit 103, Article 16(2). The AoA dealer agreement

contains identical provisions. Exhibit 104, Article 8(4). Both of these provisions require the franchisors (1) to provide vehicles to Wackerli and (2) to provide the type of vehicles which constitute a "fair and equitable allocation and distribution of the authorized products" to Wackerli. Although the Dealer Agreements do not define "fair and equitable", it is obvious that this language requires VWoA and AoA to provide vehicles in the proper numbers, colors and mix of models to allow Wackerli *to actually sell* those vehicles in the relevant market. Thus, the conclusion in paragraph 18 in the Conclusions of Law that "the evidence does not support a finding that VWoA or AoA had an obligation to" provide vehicles in the proper numbers, colors and mix of model to make construction of the new facility by Wackerli economically viable, ignores the franchisors' obligations under the underlying Dealer Agreements.

At a fundamental level, VWoA and AoA had a *contractual* obligation to make operation of the Wackerli dealerships economically viable *irrespective of construction of the new facility*. Conclusion of Law, paragraph 18 seems to suggest that VWoA and AoA had no obligations under the Settlement Agreement to do anything to assist Wackerli in either its day to day operations or to support the *requirement* that it build a new facility. This is an untenable interpretation of the Dealer Agreements between the franchisors and Wackerli.

Moreover, this lack of obligation on the part of VWoA and AoA to provide product consistent with Wackerli's market renders the Settlement Agreement illusory insofar as the franchisors appear, based upon the Conclusion of Law, paragraph 18, to have "no obligation" whatsoever to Wackerli. A contract which places no obligation on one of the parties is an illusory contract. As noted, the existing dealer agreements

requiring the franchisors to provide a "fair and equitable" can only be construed to require the franchisors to provide to Wackerli vehicles consistent with Wackerli's market needs.

Finally, the statement in Conclusion of Law, paragraph 18 that "the evidence does not support a finding" that VWoA or AoA had obligations to provide vehicles in the proper numbers, colors and mix of models to Wackerli, is belied by the Dealer Agreements, Exhibits 103 and 104 which were admitted in their entirety. There exhibits provide a clear evidentiary basis to support the finding that VWoA and AoA in fact had an obligation to Wackerli to provide the appropriate numbers and types of vehicles not only necessary to support construction of the new facility, but to support Wackerli in its ongoing business.

**3. Wackerli requests that the issue of vehicle allocation vis a vis construction of a new sales facility be revisited.**

With due respect to the Hearing officer, it is Wackerli's position that although the analysis in the Findings of Fact, paragraphs 10 and 11 are generally correct insofar as observing that Wackerli was able, more or less, had adequate inventory and was able to sell the majority of inventory provided to Wackerli by the franchisors in 2009 and 2010, the issue that should have been addressed is whether without a guarantee of a significant increase in allocation of vehicles by VWoA and AoA, Wackerli would have sufficient cars to sustain the *new* facility.

Paul Wareing's testimony referenced two analogous examples of the correlation between a dealership expansion or construction of a new facility (whether voluntary or required by the manufacturer) and a manufacturer's commitment to allocate vehicles to

support the expansion or new construction. First, Mr. Wareing discussed expansion of Wackerli's Subaru dealership and the commiserate increase in allocated inventory by Subaru to Wackerli to support the new facility. Mr. Wareing used as a second example the significant expansion of Teton Toyota in Idaho Falls and how commiserate with expansion of that facility that Teton Toyota's inventory mushroomed to meet the demands necessary to sustain a significantly increased facility.

Moreover, and this fact is undisputed, Mr. Wareing testified that by simply expanding the service facility in the *temporary* location, Wackerli was able to double its service revenues for Audi and VWs and was handling 300-400 service orders per month, far in excess of anything it had been able to service in the old facility. Additionally, the purpose of referencing the Steve Wackerli affidavit (Exhibit 109), at least by Wackerli, was not to create a dispute with the franchisors over whether Wackerli was receiving enough inventory to keep the temporary facility economically viable or whether it was exceeding sales expectations in the pro forma, but to demonstrate that coming out of the bankruptcy, knowing that Wackerli had committed to expand its facility substantially, Wackerli would need at least 120 to 150 new vehicles per manufacturer per year which inventory would be phased in over a 12 month time frame to insure the economic viability of the new facility. *See* Exhibit 109, paragraph 13.

It is Wackerli's position that the franchisors improperly linked the financial statements and the pro forma in a clever fashion to demonstrate that Wackerli was able to sell or come close to selling all vehicles allocated and exceeded projected sales stated on the pro forma submission to support its assertion that it was providing adequate vehicles to service Wackerli's sales needs. But for the requirement that Wackerli was required to

significantly expand its franchise operation through the construction of a new facility, the franchisors' position *might be* well taken. However, Wackerli's documentary evidence, i.e. Steve Wackerli's affidavit, and Mr. Wareing's testimony clearly went to the issue of allocation of new vehicles to support a new, rather than existing facility.

Wackerli does not take issue with the general factual finding in paragraph 19 that during the years 2009 and 2010, Wackerli was able to sell, more or less, those vehicles allocated by the franchisors. Wackerli also does not take issue with the fact that sales exceeded "Wackerli's presettlement projections from its pro forma." Wackerli asserts, however, and requests reconsideration of this issue because this analysis completely misses the point of Steve Wackerli's affidavit and Paul Wareing's testimony, both regarding the pro forma and the economics of constructing a new facility. To put the issue a different way, had the issue of building a new facility never been raised, had Wackerli continued to operate in its old facility or in the temporary location, Wackerli's sales performance (1) kept the dealership economically viable and (2) as Volkswagen conceded at the hearing, in and of itself would not have justified termination of franchise. *See* Findings of Fact, paragraph 33.

It is the linkage of the inability to ramp up sufficient and appropriate types of inventory due to the franchisor's lack of cooperation over the twelve-month period described in Steve Wackerli's affidavit and Paul Wareing's analogy of the Subaru and Toyota dealerships that make this point. And, to demonstrate that Wackerli, under Mr. Wareing's management could realistically sell 120 to 150 of each brand per year, the doubling of the service revenue shows that Mr. Wareing had the skills to grow the business exponentially if given sufficient inventory in the "proper numbers, colors and

mix of models" that he was requesting. And, in fact, this issue relates inextricably to sections 1 and 2 above. Without the written guarantee of increased vehicle allocation in the numbers described by Wackerli during the hearing, Wackerli could not economically justify building a significantly expanded facility costing $1.5 to $2 million.

Wackerli had proven regardless of where it lay in the overall pecking order of VW and Audi dealers regionally, that it could sell the vehicles provided by the franchisors and demonstrated that it fairly easily could exceed the sales projections in the pro forma so there is no reason to suggest that Paul Wareing's projections related to sales of vehicles from the new facility, described in paragraph 13 of Mr. Wackerli's affidavit, were unrealistic. Moreover, and with due respect to the Hearing Officer, it is Wackerli's position that the pro forma spreadsheet was completely irrelevant to operation of the new facility.

Paul Wareing testified unequivocally as pointed out in Findings of Fact, paragraph 10:

> Wareing's testimony indicated that the expenses and income needed to operate a *new facility* that would meet both manufacturers standards (costing between $1.5 and $2 million to construct) would significantly exceed those in the pro forma. He testified that the inventory and income numbers in the pro forma would never support a new facility and *never were intended to*.

The validity of Mr. Wareing's testimony is, in fact, corroborated by the limitations of the pro forma itself. The pro forma was run only through December of 2013. As previously discussed, the Wackerli affidavit indicated that the inventory requirements of 120-150 vehicles per manufacturer per year would have to be phased in over a twelve-month period. The projections in the pro forma with regard to sales numbers reflected in dollar amounts presented to the franchisors *were never intended to be sales projections beyond the transition period* necessary to establish the new facility.

Because of this, and again with due respect to the Hearing Officer, Wackerli strongly takes issue with the statement in Findings of Fact, paragraph 11 that "the evidence presented by Wackerli to the contrary is not credible and runs counter to logic in the contemporaneous evidence surrounding the negotiations leading to the Settlement Agreement." *Wackerli has not taken a position contrary to the finding that "the pro forma was intended to establish Wackerli's projected operating income and expenses* ***while during the period a new facility was being constructed.***" There is nothing inconsistent or contrary in Wackerli's position. In fact, that is precisely what the evidence presented by Wackerli, i.e., Steve Wackerli's affidavit and Paul Wareing's testimony, were intended to establish: that the pro forma was a projection of Wackerli's temporary estimates of projected operating income and expenses during construction of the new facility. In fact, "logic" would suggest that it would be absurd to assume that Wackerli could operate a hugely expanded and significantly more costly facility based upon projections that were intended only to reflect the transitional economics during construction. Logic would, in fact, dictate that once the new facility was constructed, Wackerli would need substantially more new vehicles for sale to support the facility. The fact that Mr. Wareing was able to double service revenues in what Audi disparagingly called a "substandard" facility while attempting to begin construction on a new facility, simply reinforces Mr. Wareing's assertions that if the numbers and types of vehicles provided to Wackerli were as requested in the Steve Wackerli affidavit, that those sales could have been generated and the new facility could have been successful.

The Findings of Fact section of the Preliminary Order is replete with observations that Wackerli has failed to present "documentary" evidence regarding specific issues. By

"documentary" evidence, Wackerli assumes that the Order refers to "documents" rather than oral testimony. Especially problematic in this regard are Findings of Fact, paragraphs 16 and 23. Apropos paragraph 16, in fact, Steve Wackerli's affidavit and the attendant bankruptcy *documents* evidence the very issue that Wackerli was trying to advance with the franchisors—that Wackerli needed substantially more vehicles than what it was receiving. And, as noted, irrespective of whether the issue of vehicle allocation was a "topic[] of discussion" during negotiations leading up to the settlement agreement, the extant Deal Agreements already contained provisions requiring the franchisors to provided vehicles to Wackerli in a "fair and equitable" manner. The definition of "fair and equitable" must include allocation related to construction of a new facility or expansion of an existing one.

As to paragraph 23 of the Findings of Fact, the finding that Wackerli "did not provide any documentary evidence" that it advised the franchisors of its conclusions regarding vehicle inventory is simply incorrect, based upon the same document submissions. Moreover, there was a wealth of oral testimony on the issue from both Mr. Wackerli and Mr. Wareing.

Finally, with regard to Findings of Fact, paragraph 11 stating that Wackerli "presumably upon closer inspection and at least several months after the pro forma were [sic] provided, found the figures projected in the pro forma unrealistic [does not create] justification for noncompliance with the Settlement Agreement" completely misconstrues Wackerli's position in this matter. Wackerli *never* made a "closer inspection" of the pro forma figures because Wackerli has never understood the pro forma figures to be anything but *temporary projections during construction*. The pro forma projections were

B.A. Wackerli Co.'s Combined Petition for Reconsideration of the Hearing Officer's **12**
Preliminary Order

never presented as a long-term projection of Wackerli's operating expenses and sales projected beyond the construction phase laid out in the Settlement Agreement. The fact that the pro formas extended into 2013 was designed to incorporate the twelve-month ramp up period outlined in Steve Wackerli's affidavit.

Wackerli reiterates that its requirements for new cars and the franchisors' unwillingness to provide sufficient new cars, both in terms of number and type, put Wackerli in a position as referenced in Conclusion of Law, paragraph 19 which "inhibited or rendered impractical or impossible the performance of the Settlement Agreement by Wackerli." As noted, the Hearing Officer's interpretation of the franchisors' obligations under the Settlement Agreement, if taken literally, create an illusory and unenforceable agreement as to the franchisors. Without any type of obligation to provide a "fair and equitable" allocation of vehicles commiserate with the requirement that a $1.5 -$2 million expanded new facility be built from a business perspective, the Settlement Agreement makes no sense whatsoever. Wackerli was put into an untenable position by the franchisors' unwillingness to make any type of commitment whatsoever with regard to providing new vehicles for sales. The Conclusion of Law in paragraph 18 that "the evidence does not support a finding that VWoA or AoA had an obligation to ...provide vehicles in the proper numbers, colors and mix of models to make construction of the new facility by Wackerli economically viable" cannot be sustained. In fact, the evidence is to the contrary.

4. **Conclusion.**

Based upon the above points discussed, Wackerli respectfully requests that the Hearing Officer reconsider Conclusions of Law 17, 18 and 19 and hold that Idaho Code

§49-1613(2)(i) or (j) do apply in this case, constitute a material provision of the dealer agreements and excuse Wackerli from performance under the agreement. Additionally, Wackerli requests that the Hearing Officer reconsider the conclusion found that failure to provide said written guarantee "does not constitute a lack of good faith" be revisited and reversed. Wackerli further requests the Hearing Officer reverse its Conclusions of Law paragraphs 18 and 19 and find that the franchisors did not act in good faith in their allocation of vehicles to Wackerli for purposes of sustaining construction of the new facility.

DATED: June 21, 2012

_____
Michael D. Gaffney
Of Beard St. Clair Gaffney
Attorneys for Franchisee

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 21th day of June, 2012, I caused to be served true and correct copies of the foregoing document to the following parties:

Stephen R. Thomas
Moffatt Thomas Barrett Rock & Shields
PO Box 829
Boise, ID 83701-0829
srt@moffatt.com

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(x) Email (pdf attachment)

Owen H. Smith
Steve Yatvin
Barack Ferrazzano Kirschbaum & Nagelberg
200 West Madison Street, Suite 3900
Chicago, IL 60606
owen.smith@bfkn.com
steve.yatvin@bfkn.com

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(x) Email (pdf attachment)

Stephen Bywater
Bywater Law Office
PO Box 170399
Boise, ID 83717
bywaterlaw@gmail.com

**Via:**
( ) U.S. Mail, Postage Prepaid
( ) Hand Delivered
( ) Overnight Mail
( ) Facsimile
(x) Email (pdf attachment)

_____
Michael D. Gaffney
Of Beard St. Clair Gaffney PA
Attorneys for Franchisee