Michael D. Gaffney, ISB No. 3558
John M. Avondet, ISB No. 7438
BEARD ST. CLAIR GAFFNEY PA
2105 Coronado Street
Idaho Falls, Idaho 83404-7495
Telephone: (208) 523-5171
Facsimile: (208) 529-9732
Email: gaffney@beardstclair.com
        javondet@beardstclair.com

Attorneys for the Plaintiff

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| B.A. WACKERLI, CO., a corporation,<br><br>Plaintiff,<br><br>vs.<br><br>VOLKSWAGEN OF AMERICA, INC., a corporation, & AUDI OF AMERICA, INC., a corporation. | Case No.: CV-4:12-cv-373<br><br>AFFIDAVIT OF MICHAEL D. GAFFNEY DESIGNATING HEARING TESTIMONY IN LIEU OF LIVE TESTIMONY |

STATE OF IDAHO   )

             )ss.

County of Bonneville )

Michael D. Gaffney, having been duly sworn on oath, deposes and states:

1. I am an attorney with the law firm Beard St. Clair Gaffney PA, and counsel of record for the plaintiff, B.A. Wackerli Co., in the above entitled action.

2. I am competent to testify and do so from personal knowledge.

Affidavit of Michael D. Gaffney Designating Hearing Testimony in Lieu of   1
                                                            Live Testimony

3. Attached as Exhibit A is a true and correct copy of excerpts of the transcript of the Idaho Transportation Department hearing held April 25 and 26, 2012. The following highlighted excerpts are being designated as testimony in lieu of live testimony:

   Page 24, lines 22-25;
   Page 25, lines 1-3;
   Page 31, lines 15-25;
   Page 32, lines 1-5;
   Page 136, lines 17-25;
   Page 137, lines 1-25;
   Page 142, lines 15-19;
   Page 144, lines 12-16;
   Page 146, lines 8-22;
   Page 148, lines 2-14;
   Page 227, lines 9-18;
   Page 229, lines 8-17;
   Page 325, lines 23-25;
   Page 326, lines 1-9;
   Page 355, lines 11-25;
   Page 356, lines 1-3.

DATED: July 31, 2012

_____
Michael D. Gaffney

Subscribed and sworn to before me on this 31st day of July, 2012.

_____
Notary Public for Idaho
Residing at: Idaho Falls, ID
My Commission Expires: 9/11/14
(SEAL)

Affidavit of Michael D. Gaffney Designating Hearing Testimony in Lieu of Live Testimony — 2

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 31st day of July, 2012, I caused to be served true and correct copies of the foregoing document to the following parties:

U.S. District Court
District of Idaho
801 E. Sherman
Pocatello, ID 83201

**Via:**
(✓) CM/ECF

Stephen R. Thomas
Lee Radford
Moffatt Thomas Barrett Rock & Fields
PO Box 829
Boise, ID 83701
Fax: (208) 385-5384

**Via:**
(✓) CM/ECF

Owen H. Smith
Steve Yatvin
Barack Ferrazzano Kirschbaum & Nagelberg
200 West Madison Street, Suite 3900
Chicago, IL 60606
owen.smith@bfkn.com
steve.yatvin@bfkn.com
Fax: (312) 984-3150

**Via:**
(✓) CM/ECF
( ) Email

_____
Michael D. Gaffney
Of Beard St. Clair Gaffney PA
Attorneys for Plaintiff

Affidavit of Michael D. Gaffney Designating Hearing Testimony in Lieu of Live Testimony    3

BEFORE THE IDAHO TRANSPORTATION DEPARTMENT

STATE OF IDAHO

IN THE MATTER OF THE PROTEST
OF NOTICE OF FRANCHISE
AGREEMENT TERMINATION:

B.A. WACKERLI CO.,

    Franchisee,

vs.    Consolidated Cases

VOLKSWAGEN OF AMERICA, INC.,
and AUDI OF AMERICA, INC.,

    Franchisors.

HEARING HELD

APRIL 25-26, 2012

BOISE, IDAHO



EXHIBIT A

BURNHAM, HABEL & ASSOCIATES, INC.

Certified Shorthand Reporters

COPY
Prepared for

Mr. Gaffney

Post Office Box 835
Boise, Idaho 83701

(208) 345-5700 • FAX 345-6374 • 1-800-867-5701

Reported By

Maryann Matthews, CSR

```
 1   2011.
 2          By January 2012 Wackerli had not proceeded
 3   beyond the design phase. So they were not at a point
 4   where they had actual construction drawings that they
 5   could give to a municipality to get permits. They did
 6   not have the actual construction drawings they could use
 7   to build a facility.
 8          So we're in January 2012. They've just
 9   gotten to a point where we have design drawings and they
10   have to finish a facility at the end of March, and
11   you'll see that at this point -- while it may have been
12   a remote possibility before, by this point in time it
13   was impossible. They would not have been able to
14   complete this facility.
15          And that date was critical to Volkswagen/Audi
16   because they didn't believe that -- one, they didn't
17   believe that the facility they were put in was a proper
18   representation of these brands; and they had already
19   given Wackerli two years in that facility. That March
20   31st, 2012 date was important. At this point in time,
21   January 2012, completion by March 31st, 2012 was
22   impossible.
23          Here is one of the keys, and we're going to
24   argue this more when we get to post-trial briefing. All
25   we're ultimately going to ask you to do or ask you
                                21
```

```
 1   recommend the department to do is to affirm what these
 2   parties have already agreed to in their settlement
 3   agreement, and that is that good cause exists to
 4   terminate these dealer agreements.
 5          And this (indicating) is now in the record as
 6   well, an outline of the settlement that was provided to
 7   the bankruptcy court before there was a final settlement
 8   agreement drawn up. And in paragraph three it says in
 9   the summary:
10          "If Wackerli fails to complete the
11          construction of the facility within the
12          time frame specified" -- so ultimately
13          March 31st, 2012 -- "it shall be deemed a
14          material breach and Wackerli consents
15          that said breach shall constitute good
16          cause for termination of the dealer
17          agreements."
18          And this concept of good cause to terminate
19   is -- runs throughout the agreement. There's a time of
20   essence clause. Here you have from the Audi facility
21   addendum:
22          "Dealer acknowledges that Audi would have
23          good cause under the Idaho Motor Vehicle
24          Code to terminate this agreement."
25   Audi facility addendum, paragraph six, first sentence:
                                22
```

```
 1          "Dealer acknowledges that, in that event,
 2          Audi would have good cause for
 3          terminating or failing to renew the
 4          dealer agreement," if Wackerli failed to
 5          construct.
 6   Volkswagen facility addendum, paragraph five, first
 7   sentence:
 8          "Dealer acknowledges that, in that event,
 9          VWoA would have good cause for
10          terminating or failing to renew the
11          dealer agreement and would be acting in
12          good faith in doing so."
13          So ultimately Wackerli decided to take a year
14   off -- or close to a year off, ten months off a project
15   that was supposed to take somewhere between 18 to 23
16   months; and by the time they re-engaged there simply
17   wasn't enough time.
18          There was back and forth between the parties,
19   back and forth and comments that were always
20   contemplated to take place. But by the time Wackerli
21   re-engaged, it was -- the bottom line is it was too
22   late.
23          They agreed that if they failed to build on
24   time, there would be good cause to terminate; and
25   ultimately what we're going to ask you to recommend is
                                23
```

```
 1   just to affirm what these parties have agreed to: That
 2   there is good cause to terminate.
 3          THE HEARING OFFICER: Thank you, sir.
 4          Mr. Gaffney?
 5          MR. GAFFNEY: I'm going to reserve my
 6   opening.
 7          THE HEARING OFFICER: Okay. Mr. Yatvin, I
 8   think we had agreed at the pre-trial hearing that the
 9   order of proof would begin with you --
10          MR. YATVIN: Correct.
11          THE HEARING OFFICER: -- so the case is
12   yours.
13          MR. YATVIN: Okay. We call Eric Weidle.
14          THE HEARING OFFICER: The clerk will swear
15   you in, Mr. Weidle.
16          ERIC WEIDLE,
17   a witness having been first duly sworn to tell the
18   truth, the whole truth, and nothing but the truth,
19   testified as follows:
20
21          DIRECT EXAMINATION
22   BY MR. YATVIN:
23   Q. Mr. Weidle, can you please introduce yourself
24   to us, tell us where you live, where you're from?
25   A. Sure. My name's Eric Weidle. I work for
                                24
```

```
 1   Audi of America. I've worked for them for 12 years.
 2   Currently live in Westlake Village, California, which is
 3   a suburb of Los Angeles.
 4       Q.  And you say you've worked for Audi for 12
 5   years?
 6       A.  Yes.
 7       Q.  Let's start at the beginning. Well, let me
 8   ask this first. How long have you been working in the
 9   auto industry?
10       A.  Directly for Audi, like I said, about 12
11   years. Prior to that for a supplier to the auto
12   industry for close to ten years before that.
13       Q.  Who was the supplier that you worked with?
14       A.  R.L. Polk and Company.
15       Q.  And who is R.L. Polk and Company?
16       A.  They're a supplier of data analysis and
17   direct mail lists, targeted marketing, to the automotive
18   industry primarily.
19       Q.  And what were your roles at R.L. Polk?
20       A.  Primarily account management, so servicing
21   and selling to various accounts that we were assigned
22   to. These were all automotive accounts. So me
23   personally, at various times in my ten years, I spent
24   time calling on various G.M. divisions: Chrysler,
25   Volkswagen, Audi, and Ford Motor Company.
                            25
```

```
 1       Q.  And what type of service -- when you were
 2   with Polk, what type of service did you provide to these
 3   various manufacturers and --
 4       A.  As far as the product offering?
 5       Q.  Yeah, the product offering.
 6       A.  It varied over time. We reorganized.
 7   Originally it was more of the statistical analysis, the
 8   reporting, the registration reporting that we, as a
 9   company, now we use on our end that gives market share
10   data, market size data, market analysis in terms of
11   trying to determine perhaps an appropriate location for
12   a dealership.
13           After we relocated the account teams
14   reorganized so that we also were responsible for direct
15   mail campaigns as well.
16       Q.  Okay. Now, you had said that you did some
17   work when you were with R.L. Polk with Audi and
18   Volkswagen?
19       A.  That's right.
20       Q.  Okay. When did you work with Audi and
21   Volkswagen?
22       A.  The late '90's for probably a four-year or
23   three-year period, somewhere in there.
24       Q.  Okay. And did you provide the same types of
25   service to Volkswagen and Audi?
                            26
```

```
 1       A.  Yes.
 2       Q.  Okay. Now -- and where were you living at
 3   the time?
 4       A.  I was living in Canton, Michigan, and Lake
 5   Orion, Michigan, which are both suburbs of Detroit, near
 6   Volkswagen/Audi's headquarters.
 7       Q.  And where were Volkswagen and Audi
 8   headquartered?
 9       A.  At the time, Auburn Hills, Michigan.
10       Q.  And Audi and Volkswagen relocated their
11   headquarters --
12       A.  They have.
13       Q.  -- is that correct?
14       A.  They moved to Herndon, Virginia.
15       Q.  Now, at some point you went and joined Audi
16   of America; is that right?
17       A.  Yes.
18       Q.  When did that happen?
19       A.  November of 1999.
20       Q.  And do you -- what was your first position
21   that you had when you came over to Audi?
22       A.  Network planning manager for Audi in the
23   network development department.
24       Q.  When you say "network planning manager" and
25   "network development," can you describe what your role
                            27
```

```
 1   was and what is network development?
 2       A.  By network development I mean overall the
 3   department is responsible for franchising facilities,
 4   brand standards, and at the time also training.
 5           My role there was to look at the overall
 6   network and to plan strategies, to examine individual
 7   dealer networks of market networks like, say, a
 8   metropolitan area, say, like Los Angeles or Atlanta or
 9   even a single-point market and determine whether we had
10   proper representation, meaning the right dealers, the
11   right locations, the right number of dealers.
12       Q.  And how long were you in that role?
13       A.  Close to five years.
14       Q.  And what role did you have next?
15       A.  After that I took a position out in Seattle
16   as the area sales manager for the 14 dealer area
17   called -- I think it was at that time area 88.
18   Basically it's a district.
19       Q.  And you said you were in Seattle?
20       A.  Yes.
21       Q.  Okay.
22       A.  But the district comprised of all the dealers
23   in Alaska, Oregon, Washington, Idaho, Montana -- I think
24   that's it.
25       Q.  Okay. And so was -- what were your duties as
                            28
```

```
 1   an area sales manager?
 2      A.  We were ultimately responsible for the sales
 3   of new vehicles, certified pre-owned vehicles, training,
 4   and SSI, which is sales satisfaction, of our dealers.
 5      Q.  And did you work directly with the dealers in
 6   your area?
 7      A.  Yes.
 8      Q.  Okay.  How did you interact with them and
 9   what was your role with respect to the dealers?
10      A.  My main focus was working with the sales
11   managers, making sure they understood all the sales
12   programs that Audi would come up with on a monthly or
13   quarterly, sometimes weekly, basis to maximize sales,
14   worked with the area -- excuse me -- the salespeople
15   within dealerships, making sure they were staying up on
16   their training, on their CSI, making sure that they
17   understood the product.
18          THE HEARING OFFICER:  Excuse me.  What is
19   CSI?
20          THE WITNESS:  Yes.  CSI is sales satisfaction
21   index [sic].
22          THE HEARING OFFICER:  Okay.
23   BY MR. YATVIN:
24      Q.  That would be SSI?
25      A.  Yes, SSI.
                          29
```

```
 1      Q.  Okay.  CSI is what?
 2      A.  CSI is customer satisfaction index.  It's
 3   kind of confusing, but CSI is more correctly related to
 4   after the sales or the service experience, whereas SSI
 5   is tied to the sales experience.
 6      Q.  Sales experience meaning the customer's
 7   experience when they go to the dealership and --
 8      A.  Yes, exactly.
 9      Q.  -- buy the car?
10      A.  Uh-huh.
11      Q.  Okay.  And you said your area included Idaho?
12      A.  That's right.
13      Q.  Okay.  So was Wackerli Audi in your area?
14      A.  Yes, it was.
15      Q.  And so have you been to Idaho Falls?
16      A.  Yes.
17      Q.  And had you been to the facility that
18   Wackerli had operated at?
19      A.  Yes.
20      Q.  Okay.  That was the facility -- that was the
21   facility that was shared with Subaru and Volkswagen?
22      A.  That's right.
23      Q.  Now, how long were you in that area sales
24   manager role?
25      A.  About three years --
                          30
```

```
 1      Q.  Okay.
 2      A.  -- or more.
 3      Q.  And what was the next role that you had with
 4   Audi?
 5      A.  The company reorganized.  I ended up as the
 6   regional distribution manager in the regional office.
 7      Q.  Okay.  Regional distribution manager.  What
 8   is a regional distribution manager?
 9      A.  Responsible for allocation and distribution
10   of vehicles, Audi vehicles, to the dealers.
11      Q.  And how long were you in that role?
12      A.  Roughly six months --
13      Q.  Okay.
14      A.  -- seven months.
15      Q.  After you left that role what was your next
16   role with Audi?
17      A.  My current position.
18      Q.  What is your current position?
19      A.  Regional network development manager.
20      Q.  And you said you've been in that position how
21   long now?
22      A.  About four years.
23      Q.  Could you tell us what is the role of a
24   regional network development manager?
25      A.  We could break it down into three or four
                          31
```

```
 1   general areas, one being franchising, another one being
 2   facilities, facility development; another one brand
 3   standards; and then there is a network analysis portion
 4   of that where you're, again, looking at opportunities
 5   within markets for potentially new points.
 6      Q.  So let's break that down.  You said
 7   franchising is one of the parts?
 8      A.  Yes.
 9      Q.  What is franchising?
10      A.  When we're talking about franchising,
11   we're -- you know, dealerships, they are franchises and
12   they will occasionally change hands.  There will be what
13   we call an asset purchase agreement or in the industry
14   we call it a buy-sell where the ownership of an Audi
15   dealership will change hands.
16          So there are a number of documents that we
17   are required to collect that make sure -- part of our
18   due diligence to make sure that the new owner that's
19   coming in has the -- the background and the finances in
20   order to succeed as a dealer.
21          So that's part of it, buy-sells.  There's
22   also -- on occasion there's new points, where we
23   basically go through the same process.  We try to
24   identify candidates that would be qualified for the
25   position, and then we would again go through the
                          32
```



**Page 133**

1  Q. And that process is the process you described
2  about involving CR Studio, your architects?
3  A. Yes.
4  Q. And Wackerli decided not to go through that
5  process?
6  A. Yes.
7  Q. And so when Mr. Wareing is commenting about
8  needing design help, Wackerli had the opportunity to --
9  the Wackerli organization had the opportunity to avail
10 itself of that design help, correct?
11 A. Yes.
12 Q. And Wackerli -- did Wackerli turn that down?
13 A. Yes.
14 Q. Now, I know over the next several months --
15 and the e-mails are in the record -- that there was this
16 back and forth and comment that we discussed.
17 A. Yes.
18 Q. Did there ever come a time where there was a
19 set of the basic drawings we talked about -- site plan,
20 floorplan, elevations -- that were acceptable to Audi?
21 A. By the time early January came around, we had
22 a set of floorplans, site plans, that we could agree to.
23 Q. Okay. Now, by early January they, at that
24 point, had roughly, give or take, somewhere between two
25 and a half, three months to complete the project?

**Page 134**

1  A. Yes.
2  Q. Okay. And by that point were there any --
3  had Wackerli developed any construction drawings?
4  A. No. Not to my knowledge.
5  Q. Not to your -- and that's a fair point.
6  There were no construction drawings that had been
7  submitted to Audi?
8  A. That's right.
9  Q. And as we saw in the agreement earlier,
10 construction drawings, final construction drawings, were
11 to be submitted by December 15th, 2010?
12 A. That's right.
13 Q. Okay. Did you believe by January -- by the
14 time you ultimately had an agreement and an
15 understanding on design drawings, did you believe that
16 Wackerli could complete this project?
17 A. I believed they could not.
18 Q. Okay. And ultimately Audi made the decision
19 to terminate the dealer agreement, correct?
20 A. Yes.
21 Q. And the termination notice went out
22 mid-January?
23 A. Yes.
24 Q. Why did Audi decide to terminate mid-January
25 as opposed to wait until March 31st, 2012?

**Page 135**

1  A. Well, No. 1, there was no way they were going
2  to be able to complete the project by that time; and
3  rather than allow this thing to continue on and allow
4  the Wackerli organization to make continued investments,
5  we wanted to send a notice right then and there that
6  there was no point in doing that.
7  Q. Okay. Now, the process that you went through
8  with Wackerli from August 2011 to January 2012, when was
9  that process supposed to take place pursuant to the
10 settlement agreement?
11 A. Roughly a year earlier.
12 Q. Okay. And had that process been completed a
13 year earlier, do you believe Wackerli would have been
14 able to meet the March 31st, 2012 deadline?
15 A. Yes.
16 Q. Okay. Do you believe, had Wackerli not
17 unilaterally decided to stop the project, that they
18 could have completed this facility?
19 A. Yes.
20    (Discussion held off the record.)
21    MR. YATVIN: Mr. Bywater, that's all I have.
22    THE HEARING OFFICER: Thank you. It's ten to
23 12:00. Mr. Gaffney, do you want to start
24 cross-examination at this time or do you want to begin
25 after a lunch break?

**Page 136** 

1  MR. GAFFNEY: Let's just take a break.
2  THE HEARING OFFICER: Okay. I think we
3  talked earlier about an hour lunch break. Everybody
4  still okay with that?
5  MR. YATVIN: That is fine.
6  THE HEARING OFFICER: We'll reconvene at ten
7  to 1:00, then.
8  (Lunch recess was taken from 11:50 a.m.
9  to 12:50 p.m.)
10 THE HEARING OFFICER: Are we ready to go?
11 MR. YATVIN: We're ready.
12 THE HEARING OFFICER: I think Mr. Weidle is
13 on the stand and we were just turning the time over to
14 Mr. Gaffney for cross-examination, correct? Proceed.
15 MR. GAFFNEY: Thank you, Mr. Hearing Officer.
16
17 CROSS-EXAMINATION
18 BY MR. GAFFNEY:
19 Q. How do you pronounce your name?
20 A. Weidle.
21 Q. Weidle. Okay. I'll try not to mispronounce
22 it. Mr. Weidle, the facility that Wackerli was going --
23 was proposing to build, the new facility for VW and Audi
24 in Idaho Falls, would have been substantially larger
25 than the existing facility that they shared with

1  Subaru.
2      Is that true?
3   A. Yes.
4   Q. Okay. In fact, I think -- just to give the
5  hearing officer some perspective, I believe that the
6  actual service department for the new store would have
7  been about the size of the entire Subaru/Audi facility.
8      Does that sound about right?
9   A. Sounds about right.
10  Q. Okay. So this was clearly -- this clearly
11 would have been a physical expansion of Wackerli's
12 VW/Audi physical presence in Idaho Falls, right?
13  A. Yes.
14  Q. All right. Now, it's true, is it not,
15 that -- at least as far as you know, that Audi never
16 provided to Wackerli a written guarantee that Audi would
17 supply to Wackerli a sufficient supply of new vehicles
18 to justify an expansion of their facility?
19     There's no writing to that effect --
20  A. No.
21  Q. -- correct? It's correct --
22  A. It's correct that we did not provide a
23 written guarantee.
24  Q. My statement's correct?
25  A. Your statement's correct.

137

1   Q. Okay. Thanks. Could you take a look at, if
2  you would -- I think it's Exhibit -- it's the pro
3  formas. Do you know which one I'm talking about?
4  Because I can't --
5      MR. YATVIN: It's Exhibit 15.
6      MR. GAFFNEY: Fifteen. Sorry.
7  BY MR. GAFFNEY:
8   Q. I haven't even started questioning you and
9  I'm already losing my voice. This is not very -- this
10 does not bode well.
11     Now, I believe that you testified that your
12 job with Audi is as a regional network -- excuse me --
13 regional network division manager. Did I write that
14 down right?
15  A. Regional network development manager.
16  Q. I'm sorry. Regional network development
17 manager. And you held that position for four years,
18 right?
19  A. Yes.
20  Q. And one of your jobs in that job is to deal
21 with the development of new facilities?
22  A. Yes.
23  Q. How large is that region that you deal with?
24  A. Seventy dealers.
25  Q. Was that the Alaska, Idaho, Montana that you

138

1  talked about before or is it a larger geographic region?
2   A. So in my previous position where I was the
3  area sales manager, I was responsible for an area of 14
4  dealers in the Pacific northwest.
5   Q. Okay.
6   A. So that was the five states I'd indicated.
7  In my new position I have -- I don't know how many
8  dealers, but I'd say geographically over half the
9  country. Again, the Dakotas on west, if you exclude
10 Oklahoma and Texas.
11  Q. Is your office, your physical office, in any
12 proximity to Mr. Anthony Ray's office?
13  A. Yes.
14  Q. Could you describe that, if you would,
15 please? Do you share an office? Do you share a staff?
16  A. We share an office building. He's -- each
17 brand is separated in different wings of the building.
18  Q. But the physical location of your office and
19 his office are in the same building?
20  A. Yes.
21  Q. Would you describe him as your counterpart
22 with VW?
23  A. In some respects. They're staffed a little
24 bit differently. They have two people handling network
25 development on their side; we have one.

139

1   Q. I think you said that you had assisted in
2  developing somewhere in the neighborhood of 20-plus new
3  facilities since you've become network development
4  manager; is that --
5   A. Yes.
6   Q. Okay. My -- and I think you also indicated
7  that every time that that's done, that the people that
8  are, I guess, making application to Audi to do a new
9  facility have to submit what we call these pro formas.
10     Is that accurate?
11  A. No, not in every case.
12  Q. What are the situations where a pro forma is
13 required?
14  A. Well, we asked for it in this situation
15 because there was some concern whether or not they --
16 the -- the sales and revenues would justify making the
17 investment.
18  Q. Okay. With regard to any individual that
19 comes to Audi that wants to develop a new facility, I
20 would assume that there's some type of information
21 provided to Audi similar to what would be found on
22 Exhibit 15 because you have to have some revenue
23 projections, right?
24  A. Well, for any new points certainly.
25  Q. Okay. One of the things on Exhibit No. 15

140

**Page 141**

1  that I'd like to see if we could estimate — and I know
2  that this is just an estimate.
3       If we just look at the first page of the pro
4  forma where it has — under April '10 it has "Vehicle
5  Sales" and then there's 144,623.
6       Do you see that?
7    A.  Yes.
8    Q.  Can that be roughly translated into an
9  average number of vehicles?
10   A.  Sure. If you're talking about a specific
11 brand, it could be.
12   Q.  Let's say we're talking about Audis. What
13 would that translate to in terms of monthly sales?
14   A.  Three sales.
15   Q.  Three sales? And how about — would you be
16 knowledgeable enough to estimate what that would
17 translate into in terms of VW sales?
18   A.  It would be five or six.
19   Q.  And it's my understanding that those are —
20 those numbers there are fairly consistent with
21 Wackerli's historical sales information up to the date
22 that these pro formas were submitted.
23      Did I follow that correctly?
24   A.  The vehicle sales?
25   Q.  Right.

**Page 142**

1    A.  I believe at that point they were selling
2  more than that on a monthly basis.
3    Q.  Okay. So in reality I guess what you're
4  saying is that the actual sales were in excess of what
5  these pro forma numbers that were provided to Audi and
6  VW would reflect?
7    A.  Yes.
8    Q.  Okay. Now, if you'd turn to the next page.
9    A.  (Witness complied.)
10   Q.  How many of these pro formas do you think
11 that you have reviewed similar to this since you became
12 the network development manager?
13   A.  I'll have to think about that.
14      Maybe a half a dozen.
15   Q.  All right. The facility that Wackerli was
16 proposing to build, that was going to be somewhere in
17 the neighborhood of 1.5 to $2 million to construct.
18      Is that your understanding?
19   A.  Yes.
20   Q.  If you look down on the pro forma, second
21 page, where it says "Rent," rent's called out at $4,500
22 per month. Do you see that?
23   A.  Yes.
24   Q.  That's not a realistic rent payment for a 1.5
25 to $2 million commercial building, correct?

**Page 143**

1    A.  I would say it's not typical.
2    Q.  It's not typical. If you look down for real
3  estate taxes, it says $500 per month.
4    A.  Uh-huh.
5    Q.  Which is roughly 6,000 a year. Do you see
6  that?
7    A.  Yes.
8    Q.  Even in Idaho Falls, which has a notoriously
9  dirt-cheap property tax base, that's likely not a
10 realistic property tax number for a 1.5 to $2 million
11 commercial facility, right?
12   A.  Yes.
13   Q.  Okay. So this pro forma in reality deals
14 with moving from the Subaru/VW/Audi facility into the
15 temporary facility, right?
16   A.  I guess that wasn't my interpretation at the
17 time.
18   Q.  But that makes more sense than suggesting
19 that these pro formas deal with the finished product,
20 i.e. the $2 million building.
21      That makes more sense, right?
22   A.  Maybe in terms of the rent factor.
23   Q.  Okay. Well, you couldn't sustain that type
24 of operation selling five to six VW's a month, right?
25   A.  I would say no.

**Page 144**

1    Q.  Okay. So when Mr. Wackerli was submitting
2  his affidavit to the court, he was talking about the
3  fact that the vehicles that Audi and VW were providing
4  were insufficient to bankroll the new facility, not the
5  temporary facility, correct?
6    A.  Yes.
7    Q.  Okay. And if, in fact, historically Audi was
8  giving Wackerli even four to five vehicles a month to
9  sell, that would not have sustained a $2 million
10 facility, correct?
11   A.  Could you repeat that.
12   Q.  If Audi was giving Wackerli, for example,
13 three to five Audis a month and they were selling those
14 Audis, that would not have been sufficient to fund this
15 $2 million facility operation?
16   A.  No.
17   Q.  Okay. And as we established before, despite
18 knowing that this facility was going to be a requirement
19 under the settlement agreement and having an idea of
20 what the costs were going to be, there was never a
21 written guarantee provided to Wackerli by Audi to make
22 sure that they had sufficient inventory to make the
23 construction feasible, correct?
24   A.  No, there was no written guarantee. That's
25 correct.

```
 1    Q.  Okay.  In fact, I believe in -- it was in May
 2   of 2011, that was the -- first of all -- let's back up.
 3        These pro formas were not provided directly
 4   to you, correct?
 5    A.  Not directly.
 6    Q.  This was provided to Mr. -- is it Vogler?
 7    A.  Yes.
 8    Q.  And it's my understanding that he was
 9   Audi/VW's lawyer involved in the bankruptcy proceedings,
10   right?
11    A.  Yes.
12    Q.  Along with Mr. Jim Spinner, who is a local
13   Pocatello attorney?
14    A.  Yes.
15    Q.  Okay.  To what degree were you involved
16   personally in the bankruptcy proceedings related to
17   Wackerli?
18    A.  I was kept apprised of the situation as it
19   was developing.
20    Q.  Did you --
21    A.  But I didn't -- I wasn't a part of any of the
22   hearings.
23    Q.  Okay.  You do recall at one point you
24   submitted an affidavit to the bankruptcy court?
25    A.  Yes.
                        145
```

```
 1    Q.  Okay.  And I don't need to go into that
 2   because it's not really a profoundly important
 3   document.
 4        But the point is that you had some
 5   involvement, even if tangentially, with that bankruptcy,
 6   right?
 7    A.  Yes.
 8    Q.  And I believe that the affidavit that you
 9   submitted related to a motion that Wackerli had filed in
10   the bankruptcy court in May of 2011 requesting that the
11   court in some fashion either modify the settlement
12   agreement or, by judicial order, require Audi and VW to
13   provide a sufficient number of vehicles per month for
14   the Wackerli construction to be viable.
15        That was one of the motions that -- that's
16   the reason that your affidavit was requested, right?
17    A.  Yes.
18    Q.  Okay.  So that issue was actually something
19   that was a problem at least sufficient enough for
20   Wackerli's bankruptcy lawyer to bring it to the court's
21   attention in May of 2011, right?
22    A.  Yes.
23    Q.  And what Judge Pappas did is he denied the
24   motion that Wackerli filed, saying this is not something
25   that the federal court should be dealing with, right?
                        146
```

```
 1    A.  Yes.
 2    Q.  So there was never a judge that determined
 3   that, in fact, Audi should or should not provide the
 4   sufficient number of vehicles, right?
 5    A.  Right.
 6    Q.  And that never did get resolved beyond that
 7   point, correct?
 8    A.  Right.
 9    Q.  That was an ongoing concern that the people
10   at Wackerli were communicating to you all throughout
11   this process, right?
12    A.  I would say no.
13    Q.  The issue wasn't just with the number of
14   vehicles but it was also with the mix of vehicles,
15   right?
16        If you read Mr. Wackerli's affidavit, he
17   doesn't just talk about numbers; he talks about color,
18   style, et cetera, right?
19    A.  Yes.
20    Q.  And that's because you don't order a
21   convertible in March, knowing that you're not going to
22   get it until probably November.
23        So it's important not just the number of
24   vehicles but the type of vehicles and when they are
25   provided to the dealer, right?
                        147
```

```
 1    A.  Maybe you can clarify that question.
 2    Q.  What Wackerli was complaining about was not
 3   just that they were not getting an insufficient -- they
 4   were not getting a sufficient number of vehicles to
 5   bankroll the construction of the new facility but they
 6   also were not getting the right models or colors or
 7   styles of vehicles?
 8    A.  Yeah.  I believe they came forth and
 9   requested a certain specific mix.
10    Q.  Okay.  Because the market in Idaho Falls is
11   likely going to be substantially different than the
12   market in Los Angeles in terms of what moves and what
13   doesn't in terms of vehicles?
14    A.  It could be different, yes.
15    Q.  Okay.  Now, you were asked to look at Exhibit
16   106, which I believe was a copy of -- eventually this
17   three-ring binder is going to fall apart.
18        The settlement agreement that is attached to
19   that court document, that was between Subaru and
20   Wackerli, right?
21    A.  Yes.
22    Q.  Okay.  Now, the reason that Wackerli didn't
23   initially provide this to VW or Audi was because this
24   particular agreement, which never came to fruition, but
25   the guts of this agreement was that it was Subaru that
                        148
```

**Page 225**

1 up.
2 (Discussion held off the record.)
3 MR. YATVIN: Oh, okay.
4 BY MR. YATVIN:
5 Q. And could you turn to Exhibit 85.
6 A. Yes.
7 Q. And could you tell me what Exhibit 85 is?
8 A. It's an e-mail from myself to Paul. And I
9 had received feedback from our architectural term --
10 architectural firm. And rather than trying to re-edit,
11 revise, any of the comments, I simply forwarded them on
12 just to save time. But it was -- the attachment was
13 the -- the -- the draft version of the floorplan with
14 the furniture.
15 Q. And we see that as one -- as one of the
16 attachments we see the floorplan, kind of a sketched-out
17 floorplan?
18 A. Yes.
19 Q. And if you take a look back at the e-mail
20 itself -- do you see that?
21 A. Yes.
22 Q. Please look at the second paragraph. And can
23 you read to us the last sentence?
24 A. Yes.
25 "Please review the attached plans and

**Page 226**

1 comments and please send questions
2 directly to me for consideration. If
3 adapted as is you would be allowed to
4 proceed forward with 30 percent
5 drawings."
6 Q. So later on on December 9th when you were
7 referring to the plan that was provided is approved by
8 Audi, is it what you provided from CR Studio?
9 A. Yes.
10 Q. Okay. And in that e-mail, Exhibit 85, you
11 said:
12 "If adapted as is you would be allowed to
13 proceed forward with 30 percent
14 drawings."
15 A. Yes.
16 Q. Okay. Did the Wackerli organization adapt
17 the sketches you provided on December 6th as is?
18 A. No, not as is.
19 (Discussion held off the record.)
20 THE WITNESS: No, not as is.
21 MR. YATVIN: That's all I have, Mr. Bywater,
22 on that.
23 THE HEARING OFFICER: Thank you. Okay. Your
24 next witness?
25 MR. YATVIN: Yes. We call Tony Ray.

**Page 227**

1 Volkswagen of America calls Tony Ray.
2
3 ANTHONY RAY,
4 a witness having been first duly sworn to tell the
5 truth, the whole truth, and nothing but the truth,
6 testified as follows:
7
8 DIRECT EXAMINATION
9 BY MR. YATVIN:
10 Q. Okay. Mr. Ray, will you introduce yourself
11 to everyone, tell us who you are, where you live, where
12 you work?
13 A. Sure. My name's Tony Ray, also known as
14 Anthony and -- and by my e-mail address. I work for
15 Volkswagen of America. I've worked for Volkswagen of
16 America since December of 1999. Live in the Los Angeles
17 area and have been out in the Los Angeles area for --
18 since November 2004.
19 Q. And you said you've worked with the company
20 since 1999?
21 A. Yes.
22 Q. Okay. Prior to working with the company did
23 you -- what did you do professionally?
24 A. I was a consultant for Price Waterhouse
25 Coopers, their management consulting arm; and prior to

**Page 228**

1 that I worked for a company called Electronic Data
2 Systems or EDS.
3 Q. Now, when you came over to Volkswagen in
4 1999, can you tell us -- walk us through the positions
5 you've had generally?
6 A. I joined the company in their -- what they
7 call their process and logistics area of the business,
8 which encompassed about managing production at our
9 factories from a forecast and order of management
10 perspective.
11 We had also numerous information technology
12 projects going on to enhance our systems in the company
13 and I ran the program management office, which was --
14 kind of had oversight for all the projects that were
15 going on at once, that they continued to be linked with
16 the strategic direction of the company and that they
17 were generally completed on time and appropriate
18 budget.
19 I took a role as the leader for what we call
20 the forecast and order management team that managed the
21 production coming out of Mexico and Brazil to the U.S.
22 market, U.S. and Canada market, just ensuring that our
23 forecasts were in line with production and that the
24 brands were getting what they intended to achieve.
25 When I came to California, I came out as the

**Page 229**

1  distribution manager for the western region and I did
2  that until March of 2006, when I then became the network
3  development manager for the region.
4      May of 2010 I became the general manager of
5  dealer network development; and I did that up until
6  March of 2012, where I'm in my current role as general
7  manager of sales operations for the Pacific region.
8      Q. Okay. Now, the period of time that we've
9  been talking about in this matter today with Mr. Weidle,
10 were you in the G.M. network development role during
11 that entire time?
12     A. Primarily.
13     Q. Okay. Part of the time you were in the
14 other -- you were --
15     A. The early days when I think the bankruptcy
16 had occurred, I was in the network development manager
17 role.
18     Q. Okay. And I'm going to want to talk about
19 your roles in network development and what your duties
20 are there; but if you recall, Mr. Weidle told us a
21 little bit about -- since he's been with the company,
22 about what's been going on with the Audi brand.
23     I want you to tell us for the Volkswagen
24 brand -- you got there in '99, been there the last 13
25 years. Tell us what's happened with the Volkswagen

**Page 230**

1  brand in that time.
2      A. So in '99 -- when I arrived in '99, the brand
3  had just released the New Beetle, you know, a
4  reinvention of the Beetle that everybody was aware of
5  from the '50's, '60's, and '70's. And that really
6  sparked the brand into a growth mode, and that lasted
7  well into the early 2000's.
8      The brand's -- the sales declined a bit after
9  that, and we went -- started to begin an increase in our
10 sales from 2007. And more recently, in 2009, for
11 example, we sold 213,000 vehicles in the United States;
12 and then in 2010 we sold 256,000, which represented a 20
13 percent increase. Through 2011 we sold 324,000
14 vehicles, which is a 26 percent increase in sales. And
15 our projected growth for 2012 is 417,000 vehicles, which
16 would be 45 percent growth.
17     So that number may sound very aggressive or
18 pie in the sky, but all of that is supported by specific
19 product lines. The Volkswagen brand made a $4 billion
20 investment in the United States with the opening of the
21 Chattanooga factory that opened in late 2010 -- I'm
22 sorry -- in 2011.
23     That factory is now up and running and it's
24 nearing full capacity of its production of cars, and so
25 all of those cars represent incremental volume to the

**Page 231**

1  United States in a segment that we were not in for years
2  prior to that.
3      Q. Okay. And that segment is what segment?
4      A. The mid-size segment. You would look at that
5  segment as including like Toyota Camry or Honda Accord.
6  We've had a Passat in the past and that's the car line
7  we call for that segment.
8      But it was a very small production and a much
9  higher price point, and now we're producing a vehicle
10 that is directly in the middle of that segment to
11 compete directly in that market.
12     Q. Now, we talked a lot today about facilities.
13 Volkswagen -- one of the grounds for termination was
14 Wackerli -- was Volkswagen's position that Wackerli
15 breached its facility commitment; is that right?
16     A. That's correct.
17     Q. But there's another reason the Volkswagen
18 brand terminated; is that correct?
19     A. In addition to the breach of the settlement
20 agreement Volkswagen has had performance issues with
21 Wackerli for some time, and that sales performance issue
22 was also reflected in our notice of termination as good
23 cause.
24     Q. Okay. And could you generally describe what
25 Volkswagen's concerns are with Wackerli's sale

**Page 232**

1  performance?
2      A. As earlier described by, I think,
3  Mr. Weidle -- (inaudible).
4      (Discussion held off the record.)
5      THE WITNESS: As earlier described by
6  Mr. Weidle, Volkswagen cannot sell directly to
7  consumers, so we rely upon our dealerships to do those
8  sales.
9      And so we are dependent, therefore, that our
10 dealers are able to sell to the volume that the brand is
11 expecting to achieve. And when we have an
12 under-performing dealer, that's a significant concern to
13 us.
14 BY MR. YATVIN:
15     Q. Are new vehicle sales part of a dealer's
16 obligation to Volkswagen?
17     A. Yes.
18     Q. Okay. And if we could turn to Exhibit 103,
19 please, Mr. Ray.
20     A. (Witness complied.)
21     Q. Can you tell us what Exhibit 103 is?
22     A. Exhibit 103 is a copy of the Volkswagen
23 dealer agreement.
24     Q. Volkswagen dealer agreement with who?
25     A. With B.A. Wackerli Company, Inc.



1  typical facility process?
2     A. Yes. Clint Sly would be involved from the
3  very start of the project all the way through to the
4  completion of construction. He's very knowledgeable
5  about our facility program and what's required and is
6  very effective in communicating, you know, how to make
7  certain changes and comply with what's required.
8     Q. And I believe you had mentioned yesterday in
9  addition to the services that Mr. Sly provides, there is
10 also an architect on the Volkswagen side that's involved
11 typically?
12    A. That is correct. So when a dealer submits
13 construction drawings in the process, those drawings
14 would get submitted to our architect for review and
15 comment, you know, as part of that iterative process in
16 the -- in the process.
17    MR. YATVIN: Those are all the questions I
18 have right now.
19    THE HEARING OFFICER: Thank you, Mr. Yatvin.
20 Mr. Gaffney?
21    MR. GAFFNEY: Thank you.
22
23    CROSS-EXAMINATION
24 BY MR. GAFFNEY:
25    Q. Mr. Ray, with regard to Volkswagen of

325

1  America's -- is that the correct name for the company?
2     A. Volkswagen of America, Inc. is a wholly owned
3  subsidiary of Volkswagen Group of America, Inc.
4     Q. Okay. On behalf of Volkswagen of America,
5  Inc. it is true, is it not, that there was never any
6  written guarantee regarding providing sufficient cars or
7  inventory for expansion of the Wackerli facility in
8  Idaho Falls, correct?
9     A. There is no written guarantee.
10    Q. All right. I'm going to bounce around a
11 little bit here, but I want you to turn back to Exhibit
12 70, if you would, please.
13    A. (Witness complied.)
14    Q. And this was the e-mail that was sent to you
15 from Paul Wareing dated 11-4 of 2011, and in the third
16 paragraph he says: "As to who has delayed this project,
17 we disagree." And then he says:
18    "In Idaho, state franchise law requires
19    you to provide us with a written
20    guarantee of enough product to support
21    the facility you are requiring us to
22    build, not how fair you believe your
23    allocation process has been in the past."
24    This has been a recurring or ongoing issue
25 with Wackerli going all the way back to 2010 in the

326

1  bankruptcy court, correct?
2     A. I don't know that to be true.
3     Q. Okay. You were not involved in any of the
4  negotiations related to the settlement agreement, right?
5     A. That's correct.
6     Q. All right. So when your counsel asks you
7  what was the intent of the agreement, you don't have
8  personal knowledge as to what the intent of Volkswagen
9  was at the time the agreement was entered into, correct?
10    A. Which agreement are you referring to?
11    Q. The settlement agreement that came out of the
12 bankruptcy court.
13    A. I believe that Volkswagen's intent is fully
14 outlined in the language contained within the agreement
15 and that there was no intent outside of the agreement.
16    Q. Okay. But you don't have any personal
17 knowledge other than what you gleaned from the document,
18 correct?
19    A. I have many years of experience with
20 Volkswagen and have seen multiple agreements and
21 experience in participating in the development of those
22 agreements, and Volkswagen's intent is always reflected
23 within the agreement.
24    Q. I want you to turn to Exhibit 130, if you
25 would, please.

327

1  Are you there?
2     A. Not quite.
3     Q. All right. Are you there now?
4     A. Yes.
5     Q. Okay. You testified about this particular
6  exhibit on direct that nine vehicles were sold to other
7  dealers, and I believe you -- this was your testimony,
8  that is within the dealer's prerogative?
9     A. Yes.
10    Q. Okay. So there is nothing that would put
11 Wackerli in violation of any of its -- of its dealer
12 agreement with Volkswagen of America, this selling
13 vehicles to other dealers?
14    A. Well, indirectly if they put themselves in a
15 position where they're unable to meet the terms of the
16 dealer agreement as far as sales performance is
17 concerned, you know, that that would be a linkage to
18 something that would be problematic for the store. But
19 we do not prevent dealers from selling cars or trading
20 vehicles between other dealers.
21    Q. Okay. Now, you indicated that your response
22 to seeing Exhibit 130 was something to the effect that,
23 well, if Wackerli is in the position that they're
24 selling vehicles to other dealers, they may -- they must
25 have a sufficient or adequate number of vehicles.

328

**Page 353**

1     A. I would need to refer to the actual
2 registrations in that market by different segments and I
3 could articulate for you preferences of makes and models
4 based on that segmentation, which from that you could
5 decide that, you know, small cars in a certain segment
6 sell better in eastern Idaho than they do in Arizona,
7 you know. I could give you some of that comparative
8 analysis.
9     Q. You remember we talked about -- what was it,
10 pump-in/pump-out? Did --
11     A. Yes.
12     Q. -- I get that term correct?
13     And that has to do with people shopping -- If
14 I follow this correctly, people that might live in Idaho
15 Falls shopping somewhere else and buying somewhere else?
16     A. Yes.
17     Q. Okay. Now, a lot of these locations in the
18 western region -- there are multiple VW dealers within a
19 metro area, correct? For example, Salt Lake City.
20     A. Yes.
21     Q. And don't they have -- I think they've got
22 three dealers at least down there?
23     A. Two in Salt Lake City close proximity and
24 then there's additional two on outlying areas.
25     Q. Okay. And those were the two -- or that was

**Page 354**

1 the main -- would it be a pump-out or a pump-in where
2 people from Idaho Falls are buying VW's?
3     A. So if another dealer sells a car to a person
4 who lives in Wackerli's PAI, that's a pump-in.
5     Q. Pump-in. And as you testified yesterday,
6 most of the pump-in's came from the Salt Lake area,
7 right?
8     A. Yes.
9     Q. Okay. Now, you -- I don't know how familiar
10 you are with that area, but that's about 180 miles from
11 Idaho Falls, which to me is a fairly significant
12 distance to go to shop for cars.
13     That could suggest that part of the reason
14 people are going to Salt Lake City is that they just
15 don't have the vehicle selection in Idaho Falls that's
16 adequate to meet their needs, right?
17     A. That would be one possibility. There's many
18 others.
19     Q. And that was one of the issues, again, that
20 historically, going way back even to the bankruptcy,
21 that Wackerli had been trying to impress upon
22 Volkswagen, right?
23     A. I don't think so. Dealers have a fairly
24 collegial relationship with other dealers and they
25 oftentimes -- if a car -- that configuration they don't

**Page 355**

1 have is at a neighboring dealer, they'll trade for that
2 car in order to accommodate that customer. It's
3 unfortunate whenever a customer has to drive so far to
4 purchase a vehicle.
5     So sometimes customers will make that choice
6 because they either don't want to deal with the dealer
7 in the market or they have other reasons, meaning their
8 sister lives in that market and it was convenient to
9 visit their sister and buy a car. I mean there's many
10 reasons that can occur.
11     Q. You'll agree that if the Volkswagen
12 dealership agreement with Wackerli is terminated, that's
13 going to leave basically from Idaho Falls a hole for
14 about 150-mile perimeter where there's no service and
15 there's no sales of Volkswagens?
16     A. I don't agree with that. We would seek to
17 reappoint a dealer in the market to service those
18 customers.
19     Q. Do you have anybody in mind as we sit here
20 today?
21     A. I do not. A Volkswagen franchise right now
22 is a very desirable franchise to have. The brand's
23 growing, and I'm reasonably certain that there's a good
24 number of qualified candidates that would apply for the
25 appointment.

**Page 356**

1     Q. But as we sit here today, you don't have any
2 specific people waiting in the wings?
3     A. No.
4     MR. GAFFNEY: All right. That's all I've
5 got.
6     THE HEARING OFFICER: Thank you, sir. Let's
7 take a ten-minute break, start up again at 10:30.
8     (Recess taken.)
9     THE HEARING OFFICER: Go ahead, Mr. Yatvin.
10     MR. YATVIN: Thank you.
11
12     REDIRECT EXAMINATION
13 BY MR. YATVIN:
14     Q. Mr. Ray, there were some questions about
15 allocation, allocation guarantees. You reviewed the
16 settlement agreement in this case?
17     A. Yes.
18     Q. Okay. Is there anywhere in that settlement
19 agreement where Volkswagen or Audi agreed to provide
20 Wackerli with a certain amount of allocation?
21     A. No.
22     Q. And there was some questions asked about
23 vehicle mix. Let me ask you this. Do dealers have any
24 control over their mix of vehicles, "mix" being the
25 color and the options, that sort of thing?